## NATIONAL LABOR RELATIONS BOARD v. WALLICK et al.

### No. 10705.

United States Court of Appeals
Third Circuit.

Argued June 5, 1952.

Decided Aug. 1, 1952.

478

Samuel Singer, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Gerald F. Krassa, Atty., for National Labor Relations Board, Washington, D. C., on the brief), for National Labor Relations Board.

Irwin Panken, New York City, for all respondents except Rita Schwalm.

Joseph S. Lilienthal, Pottsville, Pa., for Rita Schwalm.

Lewis M. Stevens, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., on the brief, for respondents.

Before BIGGS, Chief Judge, and KALODNER and STALEY, Circuit Judges.

STALEY, Circuit Judge.

This case is before us on the petition of the National Labor Relations Board for enforcement of its order issued against respondents on August 23, 1951. Since the unfair labor practices found by the Board occurred in Spring Mills, Pennsylvania, this court has jurisdiction under Section 10 (e) of the National Labor Relations Act as amended (Act), 49 Stat. 453, as amended 61 Stat. 147, 29 U.S.C.A. § 160(e).

The events which form the basis of the unfair labor practices found by the Board took place in July and August, 1949. A charge was filed on August 26, 1949, by the International Ladies' Garment Workers' Union, Local 108 (Union) and a complaint was issued by the Board on February 14, 1950, against Sam Wallick and Sam K. Schwalm, partners, d/b/a Wallick and Schwalm Company; Wallick and Schwalm Corp.; and Spring Mills Apparel, Inc. The complaint charges unfair labor practices affecting commerce [1] within the meaning of Sections 8(a) (1), (3), and (5), and Sections 2(6) and (7) of the National Labor Relations Act as amended.[2]

During the period here involved, Sam Wallick and Sam K. Schwalm were the principals in several enterprises engaged in the manufacture of women's garments. The Spring Mills plant, the locus of the unfair practices found by the Board, is owned by Spring Mills Apparel, Inc.; its sole officers and stockholders at that time were Sam Wallick and Sam K. Schwalm. Since several legal entities owned and controlled by Wallick and Schwalm were conducted as a single integrated business enterprise, the Board seeks to hold responsible Wallick and Schwalm Corporation (a corporation also owned and controlled by Wallick and Schwalm during the period involved) and the Wallick and Schwalm partnership. After the occurrence of the unfair practices, Sam K. Schwalm died and the administratrix of his estate was made a party to this action.

The facts are as follows: With the exception of Foreman Osman and Plant Mechanic McCool, all the employees at the Spring Mills plant were women. For several months personal factors had been creating increasing tension, which erupted on the morning of July 5, 1949. The women liked Foreman Osman but were antagonistic toward McCool; events which transpired at the plant had convinced many of them that McCool was attempting to displace Osman as foreman. At the same time, relations between Schwalm and Osman had been degenerating to such a point that on July 1 Osman told the women that he might not be with them when they returned to work on July 5 after the long July 4 week-end.

When the women arrived at the plant on the morning of July 5, they assembled outside but did not go in to work. They wanted to know whether Osman would remain as foreman. When it appeared that Osman was unable to enlighten them, the wo-

1. It is clear that respondents were engaged in commerce within the meaning of the Act.

2. Hearings were held on various days from April to June, 1950, at Bellefonte, Pa., and New York City. The intermediate report and recommended order of the trial examiner were handed down on November 24, 1950.

men asserted that they wished to see Wallick. Osman testified that he called Wallick on the telephone and told him what was happening at the plant.[3] The latter urged Osman to persuade the women to go in to work because it was important that the goods at the plant be finished quickly. Wallick promised to try to visit the plant the following day.

When Osman conveyed this message to the women, they agreed to go to work. But Osman suggested that they go home and return the following day because he thought they were too "riled up" to do a fair day's work. As the employees were about to leave the plant, Schwalm arrived; with him were his son, son-in-law, and Spotts, the manager of respondents' Berrysburg plant. Schwalm, upon ascertaining what had happened, asked the women either to go into the plant, or else go home.[4] Fourteen of the fifty-six employees responded by reporting for work.

Wallick testified that Schwalm called him at about 8 or 9 o'clock in the morning and informed him what was happening at Spring Mills. Wallick stated to Schwalm, "* * * we will sell the plant and machines as fast as we can."[5] This testimony was apparently not credited by the trial examiner or the Board.

The employees who did not go in to work milled around outside and shortly thereafter decided to organize. Kerstetter, the leader of the group, telephoned an official of the International Ladies' Garment Workers' Union, who advised them to prepare signs stating their grievance. Signs were accordingly prepared and displayed by the strikers.

At about 11:30 the fourteen employees who had abandoned the strike were told by Schwalm to stop working because he considered it impossible for the work to be done properly with so few at their machines. Schwalm said he would inform them when to return. He then directed McCool, his son-in-law, and Spotts to bundle up the unfinished material so that it could be removed from the plant and finished elsewhere. While the material was being packed, Osman spoke with Schwalm, informing him that the employees had contacted a union. Osman's testimony, credited by the trial examiner and the Board, is that Schwalm became enraged and exclaimed, "If that's the case, we'll close the plant."

At least some of the women continued milling around the plant the rest of the day and deep into the night. There is evidence that some violence ensued. Metal pins were driven into the ground and planks were placed against one or two doors so as to bar egress; one or two windows were broken; someone directed a flashlight into the plant; and threats of violence were voiced against Schwalm, Spotts, and McCool, who remained in the plant until about midnight. The individual wrongdoers were never identified.

The next morning, July 6, the employees reported at the plant at the usual time. There is substantial evidence from which the Board could conclude that they had abandoned their strike and were ready for work. But the plant was locked. Thereupon the women started to mill around the plant again and carried picket signs similar to those of the previous day. In the afternoon two representatives of the union arrived on the scene. They explained to the women that it was important not to make the Osman-McCool issue the major one, and outlined the union's program with respect to wages and working conditions. The employees decided to accept this ad-

---

3. There is a conflict in testimony as to the telephone conversation. The implication from Osman's testimony is that he related to Wallick the entire incident, including the reason for the walkout. Wallick testified, however, that Osman told him he did not know why the girls refused to work.

4. Schwalm told them that "as for as

[Osman] is concerned at Spring Mills, he is through," and indicated that Spotts would be their new foreman.

5. There is evidence that Wallick telephoned his attorney, Welsh, on July 6, informing him that he would like to sell the Spring Mills plant. Welsh testified that he contracted a potential purchaser sometime between that date and July 14.

vice, and thirty-three of them signed union application cards.

Osman testified that on July 7 he spoke with Wallick on the telephone, informing him that the Spring Mills employees had been organized by a union. Wallick replied that if it was the same organization as that at Mount Carmel and Tower City he "would have nothing to do with it." This is categorically denied by Wallick.

The next day, July 8, the union wrote a letter to respondents advising them that a majority of the employees had designated it as their bargaining agent. A prompt meeting for the purpose of negotiating a collective bargaining contract was requested. The letter was received on July 15, but respondents never replied to it.

As early as July 5, the employees had consulted several citizens of the town of Spring Mills in order to enlist their help as mediators in the dispute. Hoffmeier, cashier of the local bank; Stitzer, an electrician and plumber; Shook, the postmaster; and Kniss, a retired school teacher, played active roles in an effort to effect a reopening of the plant. Hoffmeier testified that he telephoned Wallick several times during the middle and latter part of July. During the course of one of these conversations, Wallick stated that he would not or "could not operate under a union, and the girls should reject any union if they wanted to open the mill." Wallick's advice to the citizens' group was to direct their efforts toward getting the employees to reject the union. Wallick informed Hoffmeier that respondents' local attorney was Welsh.

Welsh was in contact with Hoffmeier in the middle of July and suggested that a petition of resignation from the union should be circulated among the employees. Hoffmeier accordingly drew up a petition and Stitzer, another member of the citizens' committee, circulated it among the employees, explaining to them that the plant would reopen if a majority of the women repudiated the union. Such a majority was soon attained. But Welsh was not content with the petition and informed Hoffmeier that it would be neces-

sary to secure individual letters of resignation. In the latter part of July, several members of the citizens' committee attended a meeting at Welsh's office. Welsh there stated that he believed the plant would reopen about a week after the resignations were effective, and he told them that letters of resignations would be prepared and sent to the committee. Respondents' accountant and attorney in Jersey City, Trosty, admitted drafting the letters[6] and sending them to Hoffmeier. On August 8 and 9, Kniss with the aid of Stitzer, solicited individual resignations from the girls, advising them that he believed the plant would reopen once a majority of the employees had withdrawn from the union. Welsh later reimbursed Kniss in the amount of $25 for the expenses incurred by him.

On August 3, 1949, in reply to a request by the Regional Office of the Board for information, respondents wrote that "because of business conditions [they] had decided to close and dispose of [their] plant at Spring Mills, Pa., when on the morning of July 5, 1949, the employees refused to work because of a grievance held by them against one of the employees named McCool." But respondents did not so inform the citizens' committee until August 18.

The Board found that beginning with July 6, 1949, respondents violated Sections 8(a) (1) and (3) of the Act by refusing to operate their Spring Mills plant because of their opposition to the union. The Board did not decide whether the employees' refusal to work on July 5 was activity protected by the Act. In arriving at its decision, the Board rejected respondents' contention that business reasons motivated the shutdown. Respondents' participation with the citizens' committee of Spring Mills was held to be a separate and independent violation of Section 8(a) (1).[7] The Board further concluded that on and after July 15, 1949, respondents refused to bargain collectively with the union, thus violating Sections 8(a) (1) and (5) of the Act. The order of the Board requires respondents to cease and

6. See Note 8, infra.

7. Respondents do not attack this finding.

desist from the unfair labor practices found and from interfering in any other manner with their employees in the exercise of the rights guaranteed by Section 7 of the Act. The order requires respondents to offer reinstatement to all employees with the exception of one and make them whole for the loss of wages. If respondents have not reopened their Spring Mills plant, reinstatement is ordered at any other plant they are operating, traveling and moving expenses to be borne by respondents. If necessary, respondents are ordered to dismiss all employees hired at other plants after July 6.

The principal issue in this appeal is whether substantial evidence on the whole record supports the Board's finding that respondents' refusal to reopen the plant on July 6 was motivated by their opposition to the union. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

The Board's finding that respondents refused to reopen their plant on July 6 because of union activity can be subdivided into a dual finding. First, the Board found that respondents had knowledge of union activity on July 5. Second, the Board found that respondents, knowing of union activity, decided not to reopen their plant on July 6 because of their opposition to the union.

The first finding appears to us to be the crucial one. Is there substantial evidence on the whole record that respondents knew that the employees had contacted a union? It is, of course, clear that the union activity of July 5 was only a little beyond the embryonic stage; no employees had yet joined the union and no union official was even on the scene. But if respondents refused to reopen their plant on July 6 in order to make certain that the seed would never germinate, they have violated Section 8(a) (3) of the Act. The principal basis for the Board's finding of knowledge on the part of respondents is the testimony of Osman that he told Schwalm (deceased at the time of the hearings) that the employees had contacted a union. Respondents sharply attack the credibility of Os-

man. It seems clear from the record that Osman, having been discharged from his position as foreman, harbored a grudge against respondents, and thus may have been a prejudiced witness. But the trial examiner and the Board credited his testimony. We do not think that even the rule of the Universal Camera case requires us, except in extreme situations, to substitute our judgment on credibility for that of the trial examiner and the Board. Moreover, it is certainly not incredible that Osman told Schwalm that the employees had contacted a union. It was Osman who suggested that they do so. If his purpose was to gain revenge on his employer, it is perfectly understandable that he would have been anxious to taunt Schwalm with this information. It is equally credible that Schwalm desired to learn as much as he could about the plans of his striking employees and might very well have interrogated Osman.

Respondents place considerable stress on the fact that Osman, on cross-examination, stated that the men in the plant were already wrapping up the merchandise when he started speaking with Schwalm. Thus, it is argued, even if Osman's testimony be credited, his own testimony reveals that respondents' decision to close the plant was made before they had any knowledge that the employees had contacted a union.

Since it was urgent that the goods be finished quickly, respondents no doubt decided that it was wiser to have the work done immediately at another plant rather than gamble on the duration of the strike. The goods were not removed from the plant on July 5. The mere wrapping of the material does not necessarily lead to the inference that respondents had then decided not to reopen the plant on July 6, even should the strike be abandoned. We think there is substantial evidence on the whole record that respondents had knowledge of union activity when they decided on July 5 not to reopen their plant the next day.

The second aspect of the Board's dual finding has stronger support in the record than the first. Again the Board relied principally on Osman's testimony. The

latter declared that Schwalm, on learning that the employees had contacted a union, exclaimed that he would shut down the plant. The Board stated in its decision that since Osman had testified with respect to the declaration of one now deceased, it had subjected his testimony to the closest scrutiny before deciding to give it weight.

■ We do not think there is any merit in respondents' contention that this portion of Osman's testimony is inadmissible hearsay. Schwalm's statement was a declaration of his own mental condition, viz., his intention, and was properly admissible as an exception to the hearsay rule. 6 Wigmore on Evidence §§ 1714, 1729, 1730 (3d ed.).

We cannot say that Osman's testimony should be disregarded. Nor do we think that the Board's finding rests on this alone. When respondents' conduct during the several weeks following July 6 is taken into consideration, it lends persuasive support to Osman's testimony. The evidence of respondents' hostility towards the union and their desire not to operate with it is overwhelming and looms uncontradicted upon the record. This evidence of intense union hostility manifested in the middle and latter parts of July will certainly support an inference that respondents' attitude on July 5 was similar. Angwell Curtain Co. v. N.L.R.B., 7 Cir., 1951, 192 F.2d 899, 903. Thus, the pattern of subsequent anti-union activity indirectly corroborates the testimony of Osman.

By way of affirmative defense, respondents contend that they ceased operations on July 5 because of business conditions and because of managerial difficulties. We think the Board was warranted in holding that it was not a pessimistic forecast of future business which led to the closing of the plant on July 6. The evidence adduced by respondents was inconclusive. It is true that the number of dozens of garments produced at all plants declined 7.7% in the first six months of 1949 as contrasted with the same period in 1948. But this in itself, in the circumstances of this case, would not necessitate a finding by the Board that business reasons motivated the closing of the plant. Statistics adduced by respondents reveal a much more drastic fall in dozens produced and employees on the payroll in the latter half of 1949 and early 1950. But we do not comprehend how such statistics can be accorded much weight, for the economic facts occurring after the shutdown were hardly within the knowledge of respondents on July 5. It is the economic outlook on July 5 which is crucial.

The trial examiner noted that respondents had failed to adduce evidence as to their profit-loss position. This evidence was vital and it was clearly within respondents' power to produce it. The Board would have been warranted in drawing an inference that such evidence, if adduced, would not have been favorable to respondents. See 2 Wigmore on Evidence § 285.

■ There was also a notable lack of evidence with respect to the efficiency of the Spring Mills plant as contrasted to the other four plants operated by respondents. Even if it be assumed that business conditions called for the closing down of one plant, it was incumbent upon respondents to show why the Spring Mills plant was chosen. Some evidence, although incomplete, was introduced by respondents in an effort to prove that the Spring Mills plant was a high cost plant. Upon analysis of the statistics, however, the trial examiner concluded that the Spring Mills plant was in fact one of respondents' low cost plants. This finding is clearly supported by the evidence.

We think the Board was also warranted in rejecting respondents' contention that managerial difficulties motivated the shutdown on July 6. It is apparent that respondents were prepared for the necessity of discharging Osman, for when Schwalm arrived at the plant on the morning of July 5, he stated that Spotts would be the new foreman.

■ Respondents press upon us the contention that the unprotected activities which the employees engaged in on July 5 bar reinstatement. Since the Board did not decide whether the strike was protected ac-

tivity within the meaning of Section 7 of the Act, 29 U.S.C.A. § 157, we must assume, for the purpose of this opinion, that it did not constitute protected activity. Cf. N. L. R. B. v. Reynolds International Pen Co., 7 Cir., 1947, 162 F.2d 680. Section 2(3) of the Act defines "employee" to include "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice * * *." Section 2(3) states, in effect, that the employer cannot deprive striking employees of their employee status under the Act so long as the strikers are engaged in protected activity. But the employer retains his right to discharge employees because they are engaged in unprotected activity. It does not follow, however, that employees automatically lose their employee status once they engage in unprotected activity. See Stewart Die Casting Corp. v. N. L. R. B., 7 Cir., 1940, 114 F.2d 849, 855–856, certiorari denied 312 U.S. 680, 61 S.Ct. 449, 85 L.Ed. 1119. They subject themselves to the "risk of the termination of their employment," N. L. R. B. v. Fansteel Corp., 1939, 306 U.S. 240, 256, 59 S.Ct. 490, 496, 83 L.Ed. 627, but the employer must affirmatively exercise his option to terminate the relationship, either by discharging the strikers or refusing reinstatement.

We think it is clear that respondents waived their right to discharge the fourteen employees who worked several hours on July 5. See N. L. R. B. v. E. A. Laboratories, 2 Cir., 1951, 188 F.2d 885, 886–887, certiorari denied 342 U.S. 870, 871, 72 S.Ct. 110. Moreover, the record reveals that respondents continued to look upon all the strikers as employees. The form letters of resignation from the union, prepared by Trosty, respondents' attorney, were drafted in such a way that each striker signed the letter as "employee of Spring Mills Apparel, Inc."[8]

The failure to reopen the plant on July 6 was an equivocal act; one of several reasons could have motivated it. The Board found that respondents refused to reopen the plant—not because of the unprotected strike—but because of respondents' hostility toward the union. This finding is supported by substantial evidence on the whole record. We think the Board was correct in its statement that even though unprotected activity gives the employer the right to discharge for such conduct, it does not confer upon him the right to discharge an employee for an entirely different reason. If the employer in fact discharges an employee for discriminatory reasons, he violates Section 8(a) (3) of the Act.

The mere fact that the strikers may have engaged in an unprotected strike should not deprive them of the right of reinstatement. Where strikers have engaged in a sit-down strike or have committed serious acts of violence, it has been held that the policies of the Act will not be effectuated by ordering reinstatement of the wrongdoers. N. L. R. B. v. Fansteel Corp., supra, 306 U.S., at pages 257–258, 59 S.Ct. 490; Republic Steel Corp. v. N. L. R. B., 3 Cir., 1939, 107 F.2d 472, 479–480.[9] More recently, the Board has ruled that reinstatement will not be ordered where employees have engaged in a strike unlawful under the Act. Mackay Radio & Telegraph Co., Inc., 96 N. L. R. B. No. 106 (1951), C. C. H. National Labor Relations Board Decisions 1950–1951, Par. 11,157.

8. Trosty or someone acting under his direction prepared individual letters of resignation in longhand for each employee. The form letter reads as follows:

"August   , 1949

"International Ladies Garment
  Workers Union
  Local 108
  19 A. North 4th Street
  Harrisburg, Pa.

Gentlemen:

"I hereby resign as a member of Local 108, of the International Ladies Garment Workers Union effective immediately.

  "Very truly yours,
    "Employee of Spring Mills Apparel, Inc.,
    Spring Mills, Pa."

9. Certiorari denied 309 U.S. 684, 60 S.Ct. 806, 84 L.Ed. 1027; on reapplication certiorari granted 310 U.S. 655, 60 S.Ct. 1072, 84 L.Ed. 1419, limited to an issue not here pertinent; opinion at 1940, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6.

On the other hand, minor acts of violence do not deprive strikers of the right to reinstatement. See Republic Steel Co. v. N. L. R. B., supra, 107 F.2d at page 479. The strike of July 5, even if unprotected, was in no sense unlawful. It was promptly abandoned on July 6 when the employees reported at the plant ready for work. By so doing, they made an unconditional offer for reinstatement. See Olin Industries v. N. L. R. B., 5 Cir., 1951, 191 F.2d 613, 616, 617–618, rehearing denied 5 Cir., 192 F.2d 799, certiorari denied 1952, 343 U.S. 919, 72 S.Ct. 676. Cf. N. L. R. B. v. Lightner Pub. Corp., 7 Cir., 1942, 128 F.2d 237, 239; Andrews Company, 87 N. L. R. B. 379, 394. We can hardly say that the Board abused its discretion in concluding that the strike, even if unprotected, should not bar reinstatement.[10]

Agnes Rickert and Hugh Schwalm, administrators of the estate of Sam K. Schwalm, deceased, filed an answer to the petition of the Board, alleging that they obtained their letters of administration d. b. n. on or about February 19, 1951, following the decree of the Orphans' Court of Schuylkill County, Pennsylvania, which vacated the letters of administration originally granted to Rita Schwalm. They further allege that the estate never had an opportunity to prove that Sam K. Schwalm was not a member of the partnership of Wallick and Schwalm because the estate was not represented at the hearings.

The present administrators will not be heard to raise such an objection at this time. Rita Schwalm, who was the administratrix of the estate of Sam K. Schwalm at the time the hearings were held and at the time the Intermediate Report was issued, was served with a copy of all papers served on the other respondents. Since Rita Schwalm never appeared, the order of the Board must be entered against the estate by default.

We think it follows that substantial evidence also supports the Board's finding that respondents violated Sections 8(a) (1) and (5) of the Act by refusing to bargain collectively with the union.

The petition for enforcement will be granted.

---

10. Nor should the violence which occurred on the night of July 5 bar reinstatement. The individuals responsible were never identified. The acts of some of the strikers cannot, of course, be imputed to all.

Republic Steel Corp. v. N.L.R.B., 3 Cir., 1939, 107 F.2d 472; § 6 of the Norris-LaGuardia Act, 47 Stat. 71, 29 U.S.C.A. § 106.