**NATIONAL LABOR RELATIONS BOARD
v. COAL CREEK COAL CO.**

No. 4543.

United States Court of Appeals
Tenth Circuit.

May 1, 1953.

Robert V. Magor, San Francisco, Cal.
(George J. Bott, David P. Findling, A.

Norman Somers, Norton J. Come and Nancy M. Sherman, Washington, D. C., on the brief), for petitioner.

Therald N. Jensen, Price, Utah, for respondent.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

This is a petition of the National Labor Relations Board to enforce its decision and order, made pursuant to a hearing on a conventional complaint charging the respondent, Coal Creek Coal Company, with violations of Section 8(a) (1) (2) (3) of the National Labor Relations Act, as amended, 61 Stat. 140, 29 U.S.C.A. 158(a) (1) (2) (3). The Board found and concluded that respondent had restrained and coerced its employees in violation of Section 8(a) (1); established and dominated a company union in violation of Section 8(a) (2); and discriminatorily discharged certain enumerated employees in violation of Section 8(a) (3). In addition to the usual cease and desist order, it affirmatively ordered the Company to disestablish the union found to be dominated, and to make the discharged employees whole from the time of their unconditional request for reinstatement.

 The respondent concedes the unfair labor practices with respect to the initiation and domination of the independent union, but says that the dominated union has long since been disestablished and does not now purport to exist as a bargaining unit. It is also suggested that the respondent is now in federal receivership and its assets in the process of liquidation; and that all questions of coercion and domination are therefore moot. If, as suggested (and apparently conceded in reply brief) the assets of the Company are to be sold and liquidated and all interest of the respondent therein extinguished, the questions of unfair labor practices and domination are of course moot. But the order of the Board is directed against the respondent, its officers, agents, successors and assigns, and if the respondent is to be operated through a receiver, or reorganized with respondent retaining an interest, either proprietary or managerial, the order of the Board with respect to the conceded unfair labor practices will be enforced, for such responsibility cannot be avoided by reorganizations, transfers or any other "disguised continuance." Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718; N. L. R. B. v. Baldwin Locomotive Works, 3 Cir., 128 F.2d 39; N. L. R. B. v. Colten, 6 Cir., 105 F.2d 179; Bethlehem Steel Co. v. N. L. R. B., 74 App.D.C. 52, 120 F.2d 641; N. L. R. B. v. Weirton Steel Co., 3 Cir., 135 F.2d 494; N. L. R. B. v. National Garment Co., 8 Cir., 166 F.2d 233; N. L. R. B. v. Fred P. Weissman Co., 6 Cir., 170 F.2d 952. On this record, we cannot tell whether the order is enforceable against a continuing entity. That question can be finally and appropriately determined by the Board on remand. Cf. Southport Petroleum Co. v. N. L. R. B., supra.

The only real issue in controversy is the validity of the Board's order requiring the reinstatement with back pay of employees found to have been discriminatorily discharged. That part of the order pertains to two entirely different discharges the first of which relates to one Lloyd Golding.

The evidence shows that the respondent was engaged in the operation of a coal mine near Price, Utah, and that Golding started to work loading trucks at the tipple on November 14, 1949. Some time thereafter, the United Mine Workers started an organizational campaign among the miners of that vicinity. Golding joined the Local Union on February 9, 1950, and soon thereafter began soliciting his fellow employees for membership in the union. The mine was closed in the first part of March when the U.M.W. set up picket lines, which the employees refused to cross. Most of the employees later signed an agreement, under which, as stockholders in the mining corporation, they could cross the picket lines without any anti-union stigma. On March 6, General Manager Powell took some of the employees through the picket line in an automobile. Golding and other employees were supposed to follow in a company station wagon, driven by a foreman, but when Golding and two other employees

refused to cross the picket line, saying they were members of the union, the foreman returned the station wagon and the employees to the Company headquarters. When Powell returned and learned of the incident, he drove the station wagon and some of the employees through the picket line to the mine, but Golding remained behind.

About the same time an election was conducted by the Industrial Commission of the State of Utah to determine whether the U.M.W. would represent the employees as a bargaining unit. When the U.M.W. won the election, Powell stated to the assembled employees that those who had voted for the union should strike their names from the stock-purchase agreement and their money would be refunded. Golding and two others had their names stricken from the list. A little later Powell suggested that the employees should organize an independent union. When, on March 8, Golding reported for work at the usual hour, Powell told him "you wouldn't go through that picket line when I told you to the other day so I got somebody in your place." On March 13, however, Golding returned to work at the request of the mine foreman and continued on his job of dumping coal cars until March 22.

On the night of March 21, Golding was elected recording secretary of the Local U. M.W. On the morning of the 23d, the station wagon which usually picked up the employees at their homes to take them to the mine did not come for Golding and his brother. When they went to the office to ascertain why they had not been picked up, they found no one in authority and returned home. About the time they got there, Powell telephoned them to report to the office. When, upon arrival, they asked why they had not been picked up, Powell replied that it was necessary to reduce their labor forces, and that they had less seniority than others retained. Powell finally agreed, however, that Floyd Golding had seniority over the other employees, and both he and his brother were put to work as carpenter helpers on the erection of company-owned houses. After one day, they were told that they were no longer

needed and Floyd Golding was thereafter unsuccessful in his attempts to contact Powell or other hiring authorities. Golding's job dumping coal cars was taken by Ray Bentley, who was regularly a shuttle car operator. Denying any knowledge of Golding's union affiliations, Powell testified that he was discharged because of a necessary reduction in labor force due to cancellation of coal orders; that Bentley, who replaced him, was an experienced shuttle car operator capable of performing both operations, and that as a common laborer, Golding could always be replaced easily when Bentley could not. After his discharge, Golding, apparently while engaged in picketing activities, in some way pulled up the end gate of a coal truck, dumping about a ton of coal on the road.

On the petition to enforce, the respondent contends that Golding's union activities had nothing whatsoever to do with his discharge; that he was laid off solely by reason of reduction of the force, and that thereafter he rendered himself unfit for reemployment by his conduct on the picket line. The Board, crediting Golding's testimony and discrediting Powell's, specifically found that Golding was discharged on March 23, and was thereafter refused reinstatement because of his membership and activities in behalf of the U. M.W. It was also of the opinion that Golding's conduct on the picket line was not sufficiently reprehensible to disqualify him for further employment, and we agree. Republic Steel Corp. v. N. L. R. B., 3 Cir., 107 F.2d 472; N. L. R. B. v. Wallick, 3 Cir., 198 F.2d 477, 484. In view of the whole record, it seems fairly certain that despite Powell's statement to the contrary, he knew of Golding's affiliation with the U. M. W., and in view of his expressed hostility to that union and his preference for the Company union, we cannot say that the Board's findings are clearly erroneous. Two permissible inferences may be drawn from the testimony, one, that Golding was laid off solely because of reduction in force and was less valuable than the employees who took his place. The other inference drawn by the Board is equally permissible and it must be sustained.

It is also said that Golding's complaint, although drawn and filed in his individual capacity, was in reality instigated and conducted by the U. M. W.; that Golding was merely a front for the non-complying union. Golding's membership in and activities on behalf of the non-complying union did not bar him from the protection of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq. There is nothing in Section 9(f) (g) (h) to prevent Golding from presenting his grievance to the Board as an individual. N. L. R. B. v. Augusta Chemical Co., 5 Cir., 187 F.2d 63. The Board found that the petition was filed and prosecuted on behalf of Golding as an individual, and its finding in that respect not being clearly erroneous must be sustained.

The other discharges related to ten employees who left the employment of the Company about six months after Golding's discharge. By this time the independent union had been organized and established as the bargaining agent with the Company. During the night shift of September 19, Superintendent Campbell discharged employees Garcia and Williams. When General Manager Powell learned of the discharges, he immediately fired Campbell and his helper, Grant. In protest of Campbell's and Grant's discharges, the night shift employees left their jobs, the day shift did not go to work, and the mine was closed.

At a meeting the next day, the employees signed a petition to dissolve the independent union. When former employee Grant attempted to serve the notice of dissolution upon Powell, he vehemently refused to accept it. Still later in the day, all or most of the employees called upon Powell at his office to inform him that they would return to work on condition that he reinstate Superintendent Campbell and Grant. According to the testimony of one of the employees, credited by the Board, Powell told them "all you guys that signed this petition [dissolution of the independent union] I am done with you. You can pick up your checks in half an hour." At least two other witnesses corroborated the substance of this statement. Other employees did not testify of having heard Powell say that all who signed the petition were discharged.

It is clear, and the Board concedes, that the employees struck or walked out in protest of Campbell and Grant's discharge, and that they decided to dissolve the Company union while thus protesting. It is not contended that by striking in protest against the discharge of Campbell and Grant the employees were engaging in a concerted activity for "mutual aid or protection" within the meaning of Section 7 of the National Labor Relations Act. And see N. L. R.' B. v. Wallick, 3 Cir., 198 F.2d 477. Cf. N. L. R. B. v. Globe Wireless, Ltd., 9 Cir., 193 F.2d 748; Kansas Milling Co. v. N. L. R. B., 10 Cir., 185 F.2d 413. It follows that the walk-out or stoppage, while not unlawful as in N. L. R. B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, was an unprotected activity.

The Examiner found that the discharge of the ten employees involved here was both because they struck in protest of the lawful discharges of Campbell and Grant, and because of the dissolution of the Company union. Treating the strike as unprotected, the Examiner took the view that the respondent was free to replace the strikers at any time prior to their unconditional request for reinstatement, but that their discharge before replacement was discriminatory within the meaning of Section 8(a) (3). He therefore recommended that the discharged employees be made whole from the date when they should unconditionally offer to return to work.

The Board expressly disapproved the Examiner's finding to the effect that the employees were discharged for striking in protest against the discharge of Campbell and Grant. Instead, it found that they were discharged solely for dissolving the independent union. In view of this finding, the Board found it unnecessary to determine whether the discharges would have been lawful if they had been directed against an unlawful strike.

We think the Board's findings with respect to the cause of the discharges are supported by the evidence, and we likewise find it unnecessary to decide the

lawfulness of discharges because of both protected and unprotected activities, for it is certain that an employer having a right to discharge employees for an unprotected activity may not discharge them for a discriminatory reason without violating Section 8(a) (3) of the Act. N. L. R. B. v. Wallick, supra. Cf. N. L. R. B. v. E. A. Laboratories, Inc., 2 Cir., 188 F.2d 885. But unlike the Wallick case, this record does not show that the ten employees involved here have ever unconditionally offered to return to work since leaving their jobs to engage in an unprotected activity. Although discriminatorily discharged while thus engaged, we do not think it would effectuate the purposes of the Act to make them whole from the time they illegally left their employment. Instead, we think that the purposes of the Act will be served by reinstatement upon their unconditional offer to return.

The order of the Board, as thus modified, will be enforced, provided that the respondent, its successors, transferees or assigns is in existence and comparable jobs are available. These are matters which the Board may appropriately determine upon remand.