**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CAST OPTICS CORPORATION, Respondent,**

**Textile Workers Union of America, AFL–CIO, CLC, Intervenor.**

**No. 71–1098.**

United States Court of Appeals, Third Circuit.

Argued Nov. 11, 1971.

Decided March 23, 1972.

Charles Steel, N. L. R. B., Washington, D. C., for petitioner.

Samuel Gruber, Gruber & Turkel, Stamford, Conn., for respondent.

Joel Ronald Ax, Associate Gen. Counsel, New York City, for intervenor.

Before VAN DUSEN and JAMES ROSEN, Circuit Judges, and BECKER, District Judge.

## OPINION OF THE COURT

EDWARD R. BECKER,* District Judge.

### I.

This case is before the Court on the application of the National Labor Relations Board ("Board") pursuant to Section 10(e) of the National Labor Relations Act ("Act")[1] for enforcement of its order issued on June 30, 1970 against Cast Optics Corporation ("Company"), a Hackensack, N. J. concern which is engaged in the manufacture of acrylics, plastic sheets and related products.[2] The case arises out of a bitter labor dispute between the Company and Local 656, Textile Workers Union of America, AFL-CIO ("Union"), the exclusive bargaining representative of the Company's employees.[3] The dispute evolved over a period of several months in four successive stages: *first* a concededly illegal work stoppage which was terminated by the workers' return; *second,* a period during which the Company refused to recognize and bargain with the Union; *third,* a further work stoppage by the men in protest of the Company's refusal to recognize the Union, resulting in the discharge of the strikers; and *fourth,* an unconditional offer by the strikers to return to work, but with a subsequent refusal by the Company to reinstate them.

The Board's findings were threefold in character: *first,* that the Company violated sections 8(a) (1) and (5) of

---

* Sitting by designation.

1. 61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151, et seq.

2. The Board's decision and order is reported at 184 NLRB No. 1.

3. On November 7, 1966, the Company recognized the Union as the exclusive bargaining representative of its production and maintenance employees. The Company and the Union thereupon executed a collective bargaining agreement which remained in force when ownership of the Company was transferred on January 2, 1969. The agreement contained two provisions germane to this action: (1) a no-strike clause and (2) a clause stating that the contract would expire on November 7, 1969, but allowing for modification following 60 days' notice of intention if delivered prior to that date.

the Act by refusing to recognize and bargain with the Union after the Union members returned to their jobs following the (first stage) illegal work stoppage; *second*, that the Company violated sections 8(a) (1) and (3) of the Act (i) by discharging employees who struck in protest of the Company's refusal to recognize the Union, and (ii) by refusing to reinstate the unfair labor practice strikers when they unconditionally offered to return to work; and *third* that the Company violated section 8(a) (1) of the Act by permitting nonstriking employees to assault the unfair labor practice strikers (during the third stage of the dispute). The Board's accompanying order requires the Company to cease and desist from the unfair labor practices, offer reinstatement and backpay to the striking employees whom it discharged and whom it failed and refused to reinstate upon their unconditional request, recognize and bargain (upon request) with the Union, continue in full force such benefits as it may have granted the employees after June 6, 1969, and post the appropriate notice.

The ultimate question before us, of course, is whether the Board's findings are supported by substantial evidence. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. However, in this particular appeal, with minor exception, the facts upon which the Board's order is based have not been questioned by the Company.[4] The Company's principal contention is that its reinstatement of the workers who had, admittedly, been stripped of their protection against discharge afforded by § 7 of the Act following the stage one illegal work stoppage[5] was a conditional act of condonation which was abrogated by the absenteeism and slowdown tactics of the workers after their return to work, and that this resulted in "instant decertification" of the Union which justified the Company's refusal to bargain with the Union and to reinstate the workers after the subsequent walkout. Accordingly, the main thrust of the Company's attack upon the Board's order is based not upon the Board's findings, but upon its *failure* to make findings with respect to the conduct of the workers after the (stage one) work stoppage.[6]

We will first recite the relevant facts supporting the Board's order, and examine the record in the area of the claimed abrogation of condonation (for, even in the absence of findings, there are record facts). We will then turn to an assessment of the validity of the Company's condonation theory. Since we find that, on this record, the theory cannot prevail, we will ultimately reach the question of whether the Board's findings are supported by substantial evidence and, concluding that they are, will grant the requested enforcement order.

## II.

The events precipitating the first stage of the dispute began on May 20, 1969 when Chris Masterson ("Masterson"), the Company's director of manufacturing, at the direction of Paul Daddona ("Daddona"), the Company's chief executive officer, transferred an em-

4. The only serious dispute concerned the testimony about the assault of the pickets, but the Trial Examiner discredited the Company's version.

5. *See*, N.L.R.B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682 (1939) ; United Furniture Workers of America, Local 270 v. N.L.R.B., 118 U.S. App.D.C. 350, 336 F.2d 738 (1964), cert. denied, 379 U.S. 838, 85 S.Ct. 73, 13 L. Ed.2d 44 (1964) ; Boeing Airplane Co. v. N.L.R.B., 85 U.S.App.D.C. 116, 174 F.2d 988 (1949) ; N.L.R.B. v. Dorsey Trailers, Inc, 179 F.2d 589 (5th Cir. 1950).

6. The Examiner found it unnecessary to make such findings :

"In further defense of its action Respondent sought to establish by absentee records a slowdown campaign in June which it would attribute to the Union. *I find it unnecessary to determine if such a condition existed.* But if indeed it did exist Respondent's remedy for such improper conduct, either by the employees or by the Union, would not include resort on its part to a violation of the Act." Appendix, p. 22, n. 24.

ployee named Gregorios Hernandez[7] ("Hernandez") from his job as inspector in quality control to an inspector in the glass department. Hernandez refused to accept reassignment, and, on May 22, he was discharged for "his refusal to obey or carry through orders." The following morning, Friday, May 23, the other employees reported for work but refused to perform their assigned duties, despite warnings by supervisory personnel that their refusal would lead to the hardening of large quantities of liquid plastic and result in substantial damage to the material and plant equipment. The Company's supervisory personnel thereupon disposed of as much of the material as they could to avoid damage.[8]

On the next workday, Monday, May 26, the employees again reported for work but were met at the plant entrance by supervisory personnel who stated that no employee would be admitted inside the plant unless he agreed to perform his duties in a normal manner, and that if he entered after having agreed to do so and failed to perform normally, he would be immediately discharged. On those conditions, only two or three employees entered the plant while the rest of the employees milled around outside of the plant talking to Union representatives. Later that day meetings were held between management, employees and officials of the Union, including the Union's business agent Tony Vargas ("Vargas"). The Union representatives insisted that Hernandez be reinstated and also that the Company agree to certain demands which had been submitted to the Company earlier in May[9] by Vargas. However, the Company rejected these demands as a condition of ending the strike on the grounds that the contract provided grievance procedures to settle the Hernandez affair and that the proper time to renegotiate the contract was in the fall. The Company claims that these demands were a violation of § 8(d) of the Act.[10]

7. During the early part of 1969, the management was engaged in taking inventory and a re-evaluation of the duties and responsibilities of both the supervisory and rank-and-file employees. This study allegedly revealed inadequate performance by Hernandez.

8. In the manufacture of its products, the Company uses a liquid acrylic substance known as Monomer, which is first cooked or made into "syrup" and then poured into glass molds. It is from the glass molds that the acrylic sheets are cast. After being cooked, the Monomer has to be poured when ready because, if not poured on schedule, it hardens and can freeze the equipment causing damage to the cooking, loading, unloading and glass mold system, with a possible attendant safety hazard. Daddona testified that, on May 23, approximately 120,000 pounds of Monomer had been cooked and drawn into the plant, and that the supervisory personnel tried to avoid destruction of machinery and equipment resulting from the hardening of the unpoured Monomer by disposing of the Monomer, but were unable to take care of all of it. He estimated that the Company suffered damage in the amount of $643,000. A civil suit by Cast Optics seeking $2,000,000 damages from the Union for the strike

commencing on May 23 is presently pending in the United States District Court for the District of New Jersey, Docket No. 1242–70.

9. On May 13, 1969, almost six months in advance of the contract's expiration date, Tony Vargas, the Union's business agent, mailed a list of contract proposals relating to increases in wages and other fringe benefits to Masterson; an accompanying letter requested Masterson to commence the necessary discussions as soon as possible.

10. Section 8(d) provides in pertinent part: "[W]here there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof. . . .

\* \* \* \* \*

(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days

**402**

After the Company's position was made known, Vargas agreed to urge the men to return to work but no one appeared on the following day. The Company officials thereupon notified the workers that Thursday, May 29, 1969 at 7:30 a. m. was the deadline for the men to return to their jobs and perform their duties; the Company officials declared that a failure to comply by that time would result in the discharge of those employees who continued to participate in the strike. Faced with this ultimatum, the employees abandoned the strike and returned to work. On May 29, 1969, the day that the employees returned to work, Daddona instructed Masterson "that any of the men that came back to work, there were to be no reprisals taken against them, there were to be no discharges, there was to be no harassment of anyone."

The parties agree not only that the events which we have described constituted an illegal work stoppage, but also that the Company need not have reinstated the men.[11] It follows that, when the Company accepted them back, and Daddona made his "no reprisal" statement to Masterson, their previous conduct had been condoned. We shall discuss the incidents of this condonation, about which there is sharp dispute, *infra*.

Shortly after the men returned to work, Daddona decided that the management would no longer recognize the Union as the representative of the employees. On June 9, Daddona instructed Masterson and Arthur Gaudio, the General Manager of the Company, to have no further communications or dealings with the Union, and on the same date he told the Company's disbursing department not to deduct dues from the employees' wages or to issue checks to the Union to cover dues or welfare fund payments even though they were obligations provided for in the contract with the Union. Throughout the month of June, the management refused to deal with the Union, and on June 20, the Company granted a $.05 an hour increase to the employees.

On June 29, at a meeting called by the Union, the employees voted to strike in protest of the Company's actions against the Union. The strike began the next day when picket lines were established at the plant gate. The Company responded on July 3 by sending a letter to each of the striking employees informing him that he was discharged. Undaunted, the strikers remained at their picket lines.

On July 23, during the course of picketing, 25 or 30 pickets were walking in front of the plant premises, and a considerable number of other striking employees were grouped on the other side of the street. On two or three different occasions on that day, about twenty of the nonstriking employees (presumably replacements for the strikers) rushed out of the plant, armed with pipes, pieces of plastic and two-by-fours. Using these weapons, the nonstriking employees assaulted the pickets in the unobstructed presence of the Company's supervisors. That afternoon, an unidentified individual pushed a "dipsy dumpster" (a garbage container) into the pickets while another drove a forklift into their midst. The Trial Examiner discredited the Company's version of the incidents, and, lacking a satisfactory explanation of the altercation, found that the apparent approval by the Company amounted to intimidation and harassment of the strikers. (The Board affirmed these conclusions.)

after such notice is given or until the expiration date of such contract, whichever occurs later.

Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9, and 10 of the Act, as amended, but such loss of status for such employee shall terminate if and when he is reemployed by such employer."

11. Authority for this proposition is found at n. 5, *supra*.

In late August, the Company announced new employee benefits relating to hospitalization and medical insurance, a specification of holidays, criteria for vacations and an outline of a multi-step grievance procedure. In early October, the Union called another meeting of its members and advised them of the futility of the strike and of the Union's inability to deal with the Company. The striking employees then agreed to return to work, and on October 3, the Union sent a letter to the Company, stating that the Union, on behalf of the striking employees, unconditionally offered to return immediately to their jobs. The Company, however, did not respond to the letter and did not reinstate any of the strikers.

The foregoing facts are all amply supported by the record.

## III.

As we have indicated above, even though the Board made no findings with respect to the events occurring after the men were reinstated following the (stage one) illegal work stoppage, there is evidence in the record concerning the matter. That evidence came principally from Daddona, and related to alleged deliberate absenteeism and slowdown. We will review this evidence briefly, not for purposes of making our own finding to fill the vacuum, but to further our analysis of the case and aid in consideration of the appropriateness of remand to the Board.[12]

Daddona testified that he had been told by the workers after their May 29th return that many of them had come to work in cars driven by people who were friendly with the Union's officials, and that they had to pay substantial monies to be transported from different parts of the area to get to work. Daddona thereupon "came to the conclusion" that these men were forced to ride to work in the cars from which the members of the union were personally profiting. Appendix, 104. When Daddona asked these men why they were absent, "they said that the car that they ride to work in had not come to pick them up to bring them to work." *Id.* at 104–05. Daddona also testified about the percentage of employees who were actually absent during the first week in June—fourteen percent were absent on the first day of that week, and the percentage decreased on each subsequent day of the week.[13]

The testimony of Daddona about the alleged slowdown is even less concrete and substantial. In essence, it is comprised of bare assertions by Daddona that he felt that a slowdown was taking place, principally by the forklift truck operators. As an example, Daddona asserted that they, over an unspecified period of time, would pile materials on top of other material in violation of orders so as to cause delay and confusion in the movement of goods. The remainder of Daddona's testimony on the specifics of his slowdown charge was confusing and unintelligible. The Trial Examiner received in evidence all testimony relevant to the Company's defense but the Company made no effort to corroborate Daddona's testimony with respect to the absenteeism and slowdown, and chose to rest on Daddona's testimony alone. While, as we have seen, the Trial Examiner found it unnecessary to make

12. As an alternative to reversal, the Company has suggested that we remand the case to the Board with directions that it make findings in this area. *See*, n. 16, *infra.*

13. The following list is the actual number of absentees in June 1969 as compared with a week in the preceding month. The numerator represents the number of absentees and the denominator represents the total number of employees on that day. The figures are extracted from the testimony of Daddona (Appendix 118–19) who had compiled them from the business records of the Company.

May 5 – 3/197 – Mon. – June 2 – 25/183
May 6 – 1/193 – Tues. – June 3 – 21/184
May 7 – 3/193 – Wed. – June 4 – 19/184
May 8 – 2/186 – Thur. – June 5 – 19/187
May 9 – 2/191 – Fri. – June 6 – 17/188

There was no testimony that the alleged excessive absenteeism continued beyond June 6.

findings with respect to this aspect of the testimony, he did make an observation about Daddona's testimony in general:

"Although for reasons that will be set forth hereafter I do not rely on Daddona's testimony generally, I do accept it of necessity in instances such as this where transactions are peculiarly within his sphere of activity as executive officer of Respondent. While I rely on Dadonna's testimony within the limitations noted above . . . I do not do so generally, having had full opportunity to observe his demeanor at the hearing, to consider his testimony in full, and to evaluate it against gratuitous remarks and statements he volunteered throughout the heairng [sic]. Moreover I have considered his frequent evasions, including a studied effort to avoid identifying the stationery of his own corporation and the signature of his associate, Masterson. I accordingly reject his uncorroborated testimony concerning the widespread misfeasance among the employees, and the inferences of wrongdoing which he attributes to union officials and to public officials, specifically the personnel of the police department of Hackensack, New Jersey, and the staff personnel of the Board's Regional Office." Appendix 203, n. 3, 4.

Accordingly, it would seem clear that the Trial Examiner would not have credited the absenteeism and slowdown testimony in a formal finding, had he elected to make one on the subject.

Daddona stated that his decision not to recognize the Union was based on his ultimate conclusion that he was not dealing with a "responsible" labor organization, which conclusion was motivated by several factors: (1) his feeling that the May strike was instigated by the Union;

(2) the June slowdown and absenteeism; (3) the Union's failure to process employees' meritorious grievances; and (4) his feeling that "the Presidnet [sic], Vice President and Secretary of this Union were involved in a concerted effort to steal material from this plant and to sell it for profits that they did something with." Appendix, 103.

## IV.

There is no dispute about the fact that when the Company took the workers back on May 29, it thereby condoned their having engaged in an illegal work stoppage which had stripped them of their protection against discharge under the Act. The Company has asked us to resolve the case in its favor or remand it for further findings on the basis of its interpretation of the principle of condonation.

In its conventional form, condonation takes place when the employer demonstrates a "willingness to forgive the improper aspect of concerted action, to 'wipe the slate clean.'" Confectionery & Tobacco Drivers Union, Local 805 v. N. L. R. B., 312 F.2d 108, 113 (2d Cir. 1963).[14] The Board contends in its brief that condonation occurred and was complete when the Company waived its privilege of discharging the strikers and accepted them back on a "no reprisal" basis. At oral argument, the Board, advancing its interpretation of the condonation principle, asserted that subsequent conduct of the employees does not and cannot under the law abrogate or vitiate a condonation so as to authorize reprisals by the Company against the employees or the Union. The Company, on the other hand, argues that condonation takes into account more than just the employer's acts of forgiveness; it urges that post-reinstatement activities by the employees should be considered in

14. See, also, Stewart Die Casting Corp. v. N.L.R.B., 114 F.2d 849 (7th Cir. 1940), cert. denied 312 U.S. 680, 61 S.Ct. 449, 85 L.Ed. 1119 (1940); N.L.R.B. v. Marshall Car Wheel & Foundry Co., 218 F.2d 409 (5th Cir. 1955); Packers Hide Ass'n, Inc. v. N.L.R.B., 360 F.2d 59 (8th Cir. 1966); N.L.R.B. v. Wallick & Schwalm Co., 198 F.2d 477 (3d Cir. 1952); N.L.R.B. v. Community Motor Bus Co., 439 F.2d 965 (4th Cir. 1971).

determining whether condonation has occurred. In essence, the Company submits that the condonation transaction is akin to a contract in that the employer promises that he will not discipline or discharge the illegal strikers in exchange for and on the condition that the employees, on their part, impliedly promise to resume their normal working relationship within the plant. Alternatively, the Company argues that even if condonation is complete at the time that the illegal strikers return to work, further disruptive acts by the employees after their return to work vitiates the condonation and returns the workers to their unprotected status. Principal support for the Company's position is found in Poloron Products of Indiana, 177 NLRB No. 54 (1969), which is similar in some respects to the case at bar.[15]

The gravamen of the Company's position on appeal is that the absenteeism and slowdown during the first week in June were sufficiently disruptive acts to abrogate or vitiate the condonation effected when the Company accepted the strikers back on May 29, so as to return the employees to their previously unprotected status created by their illegal strike. The Company further submits that, since the workers had lost their status as employees, the Union was no longer the bargaining representative of the workers because the Union had no employees to represent. Therefore, the argument continues, there has been an "instant decertification," as it were, and the Company is not required by the Act to bargain with a Union that has lost its representative status. On this latter point, the Company relies upon Graham v. Boeing Airplane Co., 22 LRRM 2243 (1948), 15 Labor Cases ¶ 64, 604 (1948) and Boeing Airplane Co. v. N. L. R. B., 174 F.2d 988 (D.C. Cir. 1949).

 The condonation principle rests upon "a clear public interest in the prompt settlement of labor disputes," Confectionery & Tobacco Drivers Union, Local 805 v. N. L. R. B., supra at 113, and, as a general matter, it does not appear to us that the expectation of a normal day's work in exchange for the employer's waiving of its right to discharge the employees is a subversion of the purposes of condonation or the overall policies of the Act. However, we need not and do not decide whether the condonation principle as advanced by the Company is the law of this circuit. First of all, it appears from our review of the record that, had the Examiner adopted the Company's theory of condonation in full panoply, and therefore deemed it necessary to make a finding as to whether the "absenteeism and slowdown" negated or vitiated the condonation, he would, by virtue of the inadequacy of the testimony on the subject and his rejection of Daddona's credibility have been bound to find that it did not.[16] In addi-

---

15. In *Poloron*, there was a wildcat strike and picketing for one afternoon, but all of the men went back to work the next day after the employer had promised no reprisals. Two weeks later there was another walkout related in cause to the first. Those who had participated in both walkouts were discharged while those who had participated only in the second walkout were suspended for the balance of the week. In upholding the discharges, the Board stated:

"In the instant case, however, the subsequent offense was a repetition of the very activity which had originally been condoned. As the Company puts the matter in its brief, the employees were reinstated after the first walkout with the implicit understanding that they would remain at work, and their subsequent walkout less than 3 weeks later, and for a related cause, constituted a breach by them of their part of the 'condonation' agreement." *Poloron Products, supra.*

Support for the Company's position is also found in N.L.R.B. v. Marshall Car Wheel & Foundry Co., 218 F.2d 409 (5th Cir. 1955), wherein the court stated:

"We think respondent correctly asserts that the essential elements of condonation, i. e., forgiveness and *the resumption of the former relationship between the strikers and respondent. . . .*" *Id.* at 414 [emphasis added].

Likewise, in N.L.R.B. v. Community Motor Bus Co., 439 F.2d 965 (4th Cir. 1971) the court spoke in contractual terms.

16. In its brief, the Company has argued that we should remand the case to the

tion, however, even assuming: (1) the validity of the Company's view of the condonation; and (2) that a slowdown and absenteeism did occur during the week following the return to work, the Company's actions cannot be upheld. At that juncture, the crucial issue becomes whether the Company acted lawfully in refusing to recognize and bargain with the Union after June 6. However, the *Graham* and *Boeing* cases, cited by the Company as being controlling if we were to adopt its view that the condonation was vitiated, do not make out its case.

■ The *Graham* and *Boeing* cases stand for the proposition that if an entire plant (or presumably a substantial majority of the employees) engages in a strike in violation of § 8(d), the workers lose their status as employees pursuant to § 8(d) of the Act. In such a situation, the Union has no employees to represent, and the Company's refusal to bargain with the Union is not a violation of § 8(a) (5). Such is not the situation here. It is true that in May, more than sixty days in advance of the termination date of the contract, Vargas had made demands for contract modifications which were one of the precipitating factors of the strike that followed. However, the record also indicates that the discharge of Hernandez may have been a cause. In any event, when all of the Company's employees who had engaged in the illegal work stoppage of May 23–29 returned to work, they regained their status as employees [17] and likewise, the

Union regained its position as the bargaining representative of the employees. Thus, on May 29, both the Union and the workers were entitled to the protection of the Act.

■ There are other reasons why *Graham* and *Boeing* do not apply. The post May 29, absenteeism was, as we have seen confined to a small percentage of the Company's employees, and it is not known how much the absenteeism was substantially above normal. Moreover, the number or identity of employees involved in the "slowdown" was not established either. It is fundamental that "[t]he acts of some of the strikers cannot, of course, be imputed to all. Republic Steel Corp. v. N. L. R. B., 3 Cir., 1939, 107 F.2d 472; § 6 of the Norris-La Guardia Act, 47 Stat. 71, 29 U.S.C.A. § 106." N. L. R. B. v. Wallick, 198 F.2d 477, 485 n. 10 (3d Cir. 1952). Furthermore, as the Board has pointed out, under the collective bargaining agreement between the parties, the individual acts of the employees are not chargeable to the Union.[18]

There is then a difference between a loss of status as employees and a loss of status as a Union. The Company did not show the extent of the absenteeism and slowdown and the Union's responsibility for and involvement in that conduct. Therefore, under the assumed theory of condonation, only those workers who actually participated in the slowdown would lose their status as employees via Section 8(d),[19] and the underlying rationale of *Graham* and *Boe-*

---

Board in order for it to make findings from the record concerning the absenteeism and slowdown. We have given the Company the benefit of Daddona's testimony on these matters. Notwithstanding it, the only findings that could be supported by substantial evidence would be insufficient, under our analysis, to allow the Company to refuse to bargain with the Union. Therefore, the failure to make findings is harmless.

17. *See*, n. 10, *supra*.

18. Section 9A of the collective bargaining agreement stated that "a strike, slowdown or stoppage of work not expressly author-

ized or ratified in writing by the General President of the Union . . . shall be deemed for all purposes, an unauthorized strike, in which event there shall be no liability on the part of the Union. . . . " Furthermore, Section 9E states that "the sole recourse and exclusive remedy of the Employer in the event of an unauthorized strike, shall be the right to discharge employees. . . . "

19. *Graham* and *Boeing* call into question a point which was not raised on appeal: whether the employees in this case (allegedly) lost their status as employees automatically by operation of § 8(d) or

*ing, i. e.,* that where all the workers in a company lose their status as employees, the Union has lost its majority, is not applicable.

There is still another basis for the failure of the Company's argument. This Court has recently held that a presumption of majority status of a Union exists and "an employer may refuse to bargain without violating the Act 'if but only if, he in good faith has a reasonable doubt of the Union's continuing majority' [citations omitted]. . . . An employer must, however, come forward with evidence casting 'serious doubt on the Union's majority status.'" N. L. R. B. v. Frick Company, 423 F.2d 1327 (3d Cir. 1970). The record is utterly devoid of any evidence to support a finding that any Company official entertained a good faith doubt about the majority status of the Union; the evidence points to the contrary.

## V.

■ Having reviewed the Company's theory of condonation, we have found that, even assuming the validity of the theory, the Company was not, on the facts of this record, justified in refusing to recognize and bargain with the Union. Needless to say, if the Company's theory of condonation is invalid, the result is the same. Accordingly, we state at this juncture what is implicit in our earlier observation that the facts before the Board were essentially undisputed, *i. e.,* that the Board's finding that the Company committed an unfair labor practice by refusing to recognize and bargain with the Union after May 29,

is supported by substantial evidence, and we affirm that finding.

■ It follows from the foregoing that the strike which began on June 30 may properly be classified as an unfair labor practice strike for "if an unfair labor practice had anything to do with causing the strike, it was an unfair labor practice strike." General Drivers & Helpers Union, Local 662 v. N. L. R. B., 112 U.S.App.D.C. 323, 302 F.2d 908, 911 (1962), cert. denied, 371 U.S. 827, 83 S.Ct. 48, 9 L.Ed.2d 65 (1962) and cases cited therein. Accord, N. L. R. B. v. Call, Burnup & Sims, Inc., 393 F.2d 412 (1st Cir. 1968); San Antonio Machine & Supply Corp. v. N. L. R. B., 363 F.2d 633 (5th Cir. 1966). The law is settled that workers who participate in an unfair labor practice strike do not lose their status as employees and are entitled to full reinstatement upon an unconditional offer to return to work even if replacements have been hired. Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956); N. L. R. B. v. Clearfield Cheese Co., 213 F.2d 70 (3d Cir. 1954); N. L. R. B. v. Milco, Inc., 388 F.2d 133 (2d Cir. 1968). The unfair labor practice strike of June 30 is protected by the Act, notwithstanding Section 8(d) (4) of the Act and the no-strike provision of the contract. Mastro Plastics Corp v. N. L. R. B., *supra;* N. L. R. B. v. Buitoni Foods Corp., 298 F.2d 169 (3rd Cir. 1962). Therefore the discharge of the striking employees on July 3 by the Company and its subsequent refusal to reinstate them after their unconditional offer to return on October 3 was a violation of Sections

---

whether the employer must have performed some affirmative act to cause an employee to lose his status as an employee. N.L.R.B. v. Wallick, 198 F. 477 (3d Cir. 1952) (interpreting § 2(3) of the Act).

If we assume the post-reinstatement conduct by the workers amounted to a strike, and further assume that the objective of that conduct was to force a modification of the contract (there are no findings on these points, and the record indicates contra), then the language of § 8(d) would indicate that the loss of status is automatic. However, the Com-

pany's argument would fail in spite of this mechanical approach for the reasons stated in the accompanying text. If other reasons, such as Hernandez' transfer, were the objective of the post-reinstatement conduct, then *Wallick* would require some affirmative act by the employer, such as discharging the offenders, before they lose their status as employees. The Company theory would also fail on this basis because the record reveals that the Company continued to treat the offenders as employees at all times.

**408**

8(a) (1) and (3) of the Act, and the Board's finding to that effect is supported by substantial evidence.

Finally, we affirm the Board's finding, which is also supported by substantial evidence, that the apparent acquiescence of the Company's officials in the mass egress and assault on the striking employees amounted to conduct not protected by the Act. N. L. R. B. v. Dorsey Trailers, Inc., 179 F.2d 589 (5th Cir. 1950); N. L. R. B. v. Fred P. Weissman Co., 170 F.2d 952 (6th Cir. 1948), cert. denied, 336 U.S. 972, 69 S.Ct. 942, 93 L.Ed. 1122 (1948). *See also,* Brewton Fashions, Inc. v. N. L. R. B., 361 F.2d 8 (5th Cir. 1966), cert. denied, 385 U.S. 842, 87 S.Ct. 95, 17 L.Ed.2d 75 (1966); N. L. R. B. v. Sunshine Mining Co., 110 F.2d 780 (9th Cir. 1940), cert. denied, 312 U.S. 678, 61 S. Ct. 447, 85 L.Ed. 1118 (1940).

The order of the Board will be enforced.