[S.F. No. 24331. Aug. 1, 1983.]

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION 1245 et al., Plaintiffs and Appellants, v. CITY OF GRIDLEY et al., Defendants and Respondents.

**COUNSEL**

Peter Nussbaum, Neyhart, Anderson, Nussbaum, Reilly & Freitas, Tom Dalzell, Harry M. Marsh, Maureen C. Whelan and Marsh, Mastagni & Marsh for Plaintiffs and Appellants.

Cecil W. Marr, Robert J. Loew, Loew & Marr, Davis, Cowell & Bowe, Alan C. Davis, William T. Payne, Kirsten L. Zerger, Raymond L. Hansen, Diane Ross, Winn Newman, Edith Barnett, Michael Mauer, Reich, Adell & Crost, Christopher D. Burdick, William H. Sortor and Carroll, Burdick & McDonough as Amici Curiae on behalf of Plaintiffs and Appellants.

Robert Millington, Millington & Millington, Richard S. Whitmore, William F. Kay, M. Carol Stevens, Janice Johnson, Whitmore & Kay, William A. Ward and Leverenz & Ward for Defendants and Respondents.

John M. Powers, City Attorney (Vallejo), Carter J. Stroud, City Attorney (Alameda), William P. Hopkins, City Attorney (Anaheim), William R. Galstan, City Attorney (Antioch), Allen Grimes, City Attorney (Atascadero and Santa Maria), Robin E. Faisant, City Attorney (Atherton), Dallas Holmes, City Attorney (Banning, Corona and Redlands), Charles J. Williams, City Attorney (Benicia, Lafayette and Moraga), Samuel Gorlick, City Attorney (Burbank), Jerome F. Coleman, City Attorney (Burlingame), Royal M. Sorensen, City Attorney (Camarillo and Downey), Richard Hargrove, City Attorney (Chowchilla, Firebaugh, Fowler, Kingsburg and Parlier), Marvin E. Helon, City Attorney (Clovis), S. William Abel, City Attorney (Colusa), William Camil, City Attorney (Commerce, Duarte and Santa Fe Springs), C. A. Stromsness, City Attorney (Corning and Red Bluff), Roger W. Krauel, City Attorney (Coronado), Thomas C. Wood, City Attorney (Costa Mesa), P. Lawrence Klose, City Attorney (Davis), Ronald E. Moe, City Attorney (Dixon), Michael C. Miller, City Attorney (Dorris), Lynn R. McDougal, City Attorney (El Cajon), Sidney Maleck, City Attorney (El Monte), Michael D. Milich, City Attorney (Escalon and Riverbank), Walter McCormick, City Attorney (Exeter), Thomas G. Haas, City Attorney (Fairfield), Thomas L. Woodruff, City Attorney (Fountain Valley), James A. McKelvey, City Attorney (Fresno), Bruce M. Jacobs, City Attorney (Gilroy), John W. Scanlon, City Attorney (Hayward), Clifton Reed, City Attorney (Imperial Beach), David Erwin, City Attorney (Indio), John Sanford Todd, City Attorney (Lakewood), Roger A. Grable, City Attorney (La Palma), Samuel Siegel, City Attorney (La Puente and Pico Rivera), Joseph A. Forest, City Attorney (Larkspur), Thomas R. Curry, City Attorney (Livermore), Constance K. Heneke, City Attorney (Los Altos), Walter K. Hays, City Attorney (Los Gatos), M. Dwain Smith, City Attorney (McFarland and Tehachapi), Steven F. Nord, City Attorney (Merced), Michael T. LeSage, City Attorney (Morro Bay), Peter D. Bulens, City Attorney (Mountain View), Hugh R. Coffin, City Attorney (Newport Beach), Joseph A. Forest, City Attorney (Novato), Hartley H. Bush, City Attorney (Oakdale), Theodore G. Morris, City Attorney (Pacific Grove), James S. Kostas, City Attorney (Palmdale), David Erwin, City Attorney

(Palm Desert), William J. Adams, City Attorney (Palm Springs), Evelynn M. Finn, City Attorney (Pasadena), Patrick J. Sampson, City Attorney (Pomona), Robert Roney, City Attorney (Portola), George W. Wakefield, City Attorney (Rancho Mirage), Randall A. Hays, City Attorney (Redding), Gordon C. Phillips, City Attorney (Redondo Beach), Robert G. Koch, Jr., City Attorney (Rialto), Jon A. Blegen, City Attorney (Rio Vista), John E. Woodhead, City Attorney (Riverside), G. Richard Brown, City Attorney (Rocklin), Ralph H. Prince, City Attorney (San Bernardino), Anthony Lagorio, City Attorney (San Carlos), John W. Witt, City Attorney (San Diego), George C. Thacher, City Attorney (San Luis Obispo), Douglas Dang, City Attorney (San Mateo), Frederick W. Clough, City Attorney (Santa Barbara), Edwin J. Moore, City Attorney (Santa Clara), Rodney R. Atchison, City Attorney (Santa Cruz), Mitchell B. Kahn, City Attorney (Simi Valley), William E. Thomas, City Attorney (Sonora), Robert K. Rogers, Jr., City Attorney (South San Francisco), Gerald A. Sperry, City Attorney (Stockton), James Longtin, City Attorney (Thousand Oaks), Stanley E. Remelmeyer, City Attorney (Torrance), Walter McCormick, City Attorney (Tulare, Visalia and Woodlake), James G. Rourke, City Attorney (Tustin), Linzie E. Kramer, City Attorney (Vacaville), David B. Brearley, City Attorney (Vernon), Daniel J. Curtin, Jr., City Attorney (Walnut Creek), Thomas N. Hallinan, City Attorney (Waterford), Phillip F. Mohr, City Attorney (Wheatland) and John C. Wallace, City Attorney (Winters), as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**KAUS, J.**—Plaintiffs, International Brotherhood of Electrical Workers, Local Union 1245 (union) and some of its members, appeal from a judgment denying their petition for writ of mandate and complaint for injunctive relief. They seek mandate to compel defendant, the City of Gridley (city), to meet and confer with the union regarding wages, hours and other terms and conditions of employment and an injunction requiring the city to reinstate union members' employment until or unless they are discharged for cause pursuant to adequate pretermination notice and hearing.

This case presents two issues: (1) May a local government, consistent with the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq., hereinafter MMBA or the act),[1] revoke the recognition of a public employee union

---

[1]Unless otherwise noted, all statutory references are to the Government Code.

because the union has instigated a strike? and (2) Are noncivil service employees who have engaged in a strike entitled to notice and hearing before dismissal, when city personnel rules provide that discharge must be "for stated cause," and the city has discretion to impose sanctions less severe than dismissal? We conclude that the MMBA's protection of employees' rights to participate in organizations of their own choosing, and the purposes of the MMBA—to foster employee-employer communication and improve management-personnel relations—bar the city from revoking recognition of the union under these circumstances. We also conclude that the dismissed employees were entitled to predismissal safeguards.

I

In January 1974, at a time when there was no recognized employee organization representing its employees, the City of Gridley adopted two resolutions (Nos. 2 and 3) to govern relations with its employees. Resolution No. 2 established, inter alia, a procedure by which city employees could select an exclusive bargaining representative to meet and confer with the city.[2] Resolution No. 3 provided that (1) "participation by any employee in a strike . . . is unlawful and shall subject the employee to disciplinary action, up to and including discharge," and (2) "if a recognized employee organization . . . encourage[s], or condone[s] a strike . . . in addition to any other lawful remedies or disciplinary actions, the Municipal Employee Relations Officer may suspend or revoke the recognition granted to such . . . organization . . . ."

In March 1974, the union was elected as the city employees' exclusive representative and was formally recognized by the city in April. Negotiations between the union and the city resulted in a three-year agreement effective July 1, 1975. The agreement did not contain a no-strike clause, stating only that "the City and Union recognize their mutual obligation for the continuous rendition and availability of . . . service." Nor did the agreement discuss strike sanctions. It did provide that it did not "abrogate or reduce the scope of any present plan or rule, which is not specifically covered. . . ." Notice of resolutions Nos. 2 and 3 had been mailed to the union prior to its selection by the employees as their bargaining representative.

---

[2]The city maintains that resolution No. 2 does not establish *exclusive* representation, only majority representation. However, the language of the resolution contradicts this contention. "The employee organization found to represent a majority of the employees in an appropriate unit shall be granted formal recognition *and is the only employee organization entitled to meet and confer in good faith on matters within the scope of representation for employees in such unit.*" (Italics added.)

In March 1978, negotiations for a new agreement began, but by August 22, 1978, an impasse had developed. At the union's request, a meeting was held before the city council on September 18 and, when no agreement was reached, another meeting before the council was scheduled for October 2.

On Friday, September 22, however, 18 employees of the city's public works, fire and finance departments went on strike, apparently with the knowledge and encouragement of the union. With the exception of two employees on vacation, these employees constituted the entire staffs of the affected departments. The city immediately notified the union that it considered the strike illegal. On Friday afternoon, the city's municipal employee relations officer mailed a notice to the striking workers demanding that they return to work at their next regular shift assignment or be discharged; the next regular shift for all but one of the employees was Monday, September 25. On Friday afternoon, the officer also notified the union that he had revoked its recognition as a bargaining representative.

Saturday morning, the city council met in emergency session and, after learning that the one striking employee who had been assigned to work that day had failed to report for duty, immediately dismissed all 18 striking employees, rescinding the employee relations officer's previous notice and demand. On Sunday, the union notified the city that all employees would return to work on Monday, but the city refused to accept them.

The following day petitioners filed the instant action seeking (1) a writ of mandate ordering the city to meet and confer with the union and (2) an injunction compelling the city to reinstate the employees. After the union and employees exhausted the available administrative remedies, the trial court ruled in favor of the city, concluding that the city was authorized by its resolutions to revoke the union's recognized status and to dismiss the employees summarily without any predismissal procedures. By the time of the trial court's ruling, 17 of the 18 employees had been reinstated.

## II

The MMBA neither authorizes nor prohibits in express terms revocation of recognition for any particular cause, let alone as a sanction for strikes by public employees.[3] However, as the following analysis of the

---

[3]The only express reference to revocation of recognition in the MMBA is in the third paragraph of section 3507, dealing with employee organizations, such as the union here, that have been selected as exclusive representatives after a majority vote. The paragraph provides: "Exclusive recognition of employee organizations formally recognized as majority representatives pursuant to a vote of the employees may be revoked by a majority vote of

MMBA suggests, the sanction of revocation is clearly inconsistent with its provisions guaranteeing public employees the right to be represented by organizations of their own choosing and with the stated purposes of the MMBA: to encourage communication and improve relations between local governments and their employees.

Enacted in 1968, the MMBA furnishes only a "sketchy and frequently vague framework of employer-employee relations for California's local governmental agencies." (*Organization of Deputy Sheriffs* v. *County of San Mateo* (1975) 48 Cal.App.3d 331, 336 [122 Cal.Rptr. 210].) A product of political compromise, the provisions of the act are confusing, and, at times, contradictory. Unlike the Educational Employment Relations Act, enacted in 1975, the MMBA does not establish an administrative agency such as the Public Employee Relations Board to regulate local labor relations. Rather, the act leaves to local government agencies the power to establish and enforce rules governing relations with their own employees. (See generally Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719; Comment, *The Collective Bargaining Process at the Municipal Level Lingers in its Chrysalis Stage* (1974) 14 Santa Clara Law. 397; Ross, *Implementation of the Meyers-Milias-Brown Act by California's Counties and Larger Cities, supra,* 8 Cal.Pub.Emp.Rel. No. 6.)

The extent of local government powers under the act was a subject of early dispute, spurred by language in the preamble which, if read literally, might have suggested that the statute was not intended to be binding on local governments that chose to adopt rules and regulations contrary to its provisions.[4] (See Grodin, *supra,* at pp. 723-725.) However, as Professor (now Justice) Grodin explained, "Such an interpretation is inconsistent with the general objectives of the statute as declared [elsewhere] in the preamble and with the mandatory language which appears in many of the sections." (*Id.,* at p. 724, fn. omitted.) ■ Accordingly, it is now well settled that the

---

the employees only after a period of not less than 12 months following the date of such recognition."

Despite the lack of statutory authorization, a number of local governments have apparently adopted revocation of recognition as a sanction for union strike activity. (See Ross, *Implementation of the Meyers-Milias-Brown Act by California's Counties and Larger Cities* (Mar. 1971) 8 Cal.Pub.Emp.Rel. No. 6 [listing 13 counties and cities permitting revocation of recognition as a sanction for strike]; *Hospital Workers Strike, Union Recognition Revoked* (Dec. 1981) 51 Cal.Pub.Emp.Rel. No. 29; *Strikers Replaced in Hollister Hospital Strike* (Sept. 1981) 50 Cal.Pub.Emp.Rel. No. 29 [union recognition revoked].)

[4]The preamble contains the following language: "Nothing contained herein shall be deemed to supersede the . . . rules of local public agencies which establish and regulate a merit or civil service system or which provide for other methods of administering employer-employee relations . . . ." (§ 3500.)

Legislature intended that the MMBA "set forth reasonable, proper and necessary principles which public agencies must follow in their rules and regulations for administering their employer-employee relations . . . ." and that "if the rules and regulations of a public agency do not meet the standard established by the Legislature, the deficiencies of those rules and regulations as to rights, duties and obligations of the employer, the employee, and the employee organization, are supplied by the appropriate provisions of the act." (*Los Angeles County Firefighters Local 1014* v. *City of Monrovia* (1972) 24 Cal.App.3d 289, 295 [101 Cal.Rptr. 78], quoted in *Huntington Beach Police Officers' Assn.* v. *City of Huntington Beach* (1976) 58 Cal.App.3d 492, 502 [129 Cal.Rptr. 893]; see also *Los Angeles County Civil Service Com.* v. *Superior Court* (1978) 23 Cal.3d 55, 63 [151 Cal.Rptr. 547, 588 P.2d 249]; *Public Employees of Riverside County, Inc.* v. *County of Riverside* (1977) 75 Cal.App.3d 882, 890 [142 Cal.Rptr. 521].)[5]

Notwithstanding its otherwise "sketchy" provisions, the act contains strong protection for the rights of public employees to join and participate in the activities of employee organizations, and for the rights of those organizations to represent employees' interests with public agencies. These protections are included in the preamble of the act, which declares that the act provides "*a uniform basis* for recognizing the right of public employees to join organizations of their own choice and be represented by such organizations in their employment relationships with public agencies" (§ 3500; italics added), and in section 3502, which states that "[e]xcept as otherwise provided *by the Legislature,* public employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations." (Italics added.)

These provisions suggest that the power to enact restrictions on the right of employees to be represented by organizations of their own choosing is reserved to the state Legislature. Nevertheless, other language in the act indicates that a local government's obligations to a union are largely predicated on the union's status as a "recognized" employee organization[6] and

---

[5]In *Los Angeles County Civil Service Com., supra,* 23 Cal.3d 55, we unanimously approved the above quoted Court of Appeal decisions and stated that the cases "recognize that [the preamble] reserves to local agencies the right to pass ordinances and promulgate regulations *consistent with the purposes of the MMBA.*" (23 Cal.3d at p. 63.)

[6]Section 3503 provides that "[*r*]*ecognized* employee organizations shall have the right to represent their members in their employment relations with public agencies," and section 3505 states that "[t]he governing body of a public agency . . . shall meet and confer in good faith . . . with representatives of such *recognized* employee organizations . . . ." (Italics added.)

that local entities retain at least some authority with respect to the matter of recognition. Section 3507 provides in this regard that "[a] public agency *may adopt reasonable rules and regulations* after consultation in good faith with representatives of an employee organization or organizations for the administration of employer-employee relations under [the act]. [¶] Such rules and regulations may include provisions for (a) verifying that an organization does in fact represent employees of the public agency (b) verifying the official status of employee organization officers and representatives (c) *recognition of employee organizations* (d) exclusive recognition of employee organizations formally recognized pursuant to a vote of the employees of the agency or an appropriate unit thereof . . . ." (Italics added.) Section 3507 further provides that "[n]o public agency shall *unreasonably withhold recognition of employee organizations.*" (Italics added.)

The city contends that its rule permitting it to revoke the union's recognition was "reasonable" in light of the "overwhelming potential for disaster . . . presented by an illegal strike."[7] It further contends that the last sentence of section 3507, barring local entities from unreasonably withholding recognition implies "that a city can withhold recognition of an employee organization when the grounds are reasonable." It is impossible to dispute the logic of that argument. It does not, however, solve the problem of what the Legislature considered "reasonable."

The central flaw in the city's interpretation of section 3507 is that it ignores the importance of the employees' right to join and participate in the activities of employee organizations "of their own choosing." As noted, this is not an unlimited right; section 3502 is specifically limited by the phrase, "[e]xcept as otherwise provided by the Legislature." However, we find nothing in the act to suggest that an employer may adopt *substantive* regulations authorizing it to terminate its statutory meet and confer obligation unilaterally whenever a recognized union engages in conduct the employer deems unacceptable. On the contrary, the structure and history of the act suggest that the only limitations on the right of employees to participate in the organization of their choice contemplated by the Legislature as

---

[7]We need not consider whether the strike was illegal since we hold that a city has no power under the MMBA to revoke a union's recognition for engaging in strike activity, legal or illegal. (Cf. *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 912 [120 Cal.Rptr. 707, 534 P.2d 403].) In the instant case, the union has not contested the city's assertion that the strike was illegal; we may therefore assume, for the purpose of analysis, that it was.

"reasonable" were *procedural* rules relating to the mechanics of selection and recognition of representatives.[8]

Section 3501, subdivision (b) of the act defines "recognized employee organization" as "an employee organization which has been formally acknowledged by the public agency as an employee organization that represents employees of the public agency." This language suggests that the Legislature equated recognition with representation of employees.[9] A closer examination of section 3507, on which the city relies, further substantiates this view. Although the section gives employers the right to adopt "reasonable rules and regulations . . . for . . . (c) recognition of employee organizations . . ." read in the context of other provisions in section 3507, permitting local governments to adopt rules for "(a) verifying that an organization does in fact represent employees of the public agency [and] (b) verifying the official status of employee organization officers and representatives," and specifying a variety of other procedures, it seems clear that the Legislature did not intend to grant local agencies the power to adopt substantive rules that would interfere with employee choice. Finally, in the case of exclusive representatives such as the union here, the Legislature's mandate that recognition must be grounded upon employee choice is explicit; a 1971 amendment to section 3507 states: "Exclusive recognition of employee organizations formally recognized as majority representatives *pursuant to a vote* . . . may be revoked by a *majority vote* of the employees only after a period of not less than 12 months following the date of such recognition."

---

[8]In discussing the Legislature's decision to leave the question of recognition procedures to local agencies, one commentator has explained: "Any public employee relations bill which attempted to spell out definite recognition procedures in 1968 invariably had to fail in the state legislature. Dozens of suggested bills had been unsuccessful in the past because of the impossibility of resolving differences between unions, employee associations, and employer groups. The MMBA succeeded in the legislature in large part because it was ambiguous on the issue of recognition procedures." (Comment, *supra,* 14 Santa Clara Law. at p. 401.)

[9]Indeed, an opinion of the Legislative Counsel issued after the passage of the MMBA but before the Governor's approval of the legislation concludes: "[I]n our opinion, the only basis which the public agency could establish for refusing to formally acknowledge an employee organization as a 'recognized employee organization' is that such organization failed to meet the criteria for an 'employee organization' set forth in Section 3501(a); that is, the organization did not include employees of the public agency and did not have as one of its primary purposes representing such employees in their relations with the public agency. We think that refusal by a public agency to formally acknowledge an organization as a 'recognized employee organization' on any other basis would impair the rights of employees of a public agency to form, join, and participate in the activities of employee organizations of their own choice and to be represented by such organizations in their relations with the public agency. Such refusal would, therefore, be clearly contrary to the purposes of [the MMBA]." (Ops.Cal.Legis. Counsel, No. 15526 (Aug. 2, 1968) Public Agencies: Labor Relations, 4 Assem. J. (1968 Reg. Sess.) pp. 7080, 7081-7082.)

There is, of course, a distinction between the Legislature's determination that recognition must be based on employee choice and the question of whether a local government has the power to revoke recognition for other reasons, which the Legislature apparently did not address at all. The point here is simply that the guiding principle of the statute insofar as recognition of employee organizations goes is employee choice. The city's action, revoking recognition of the union, was inconsistent with that principle.[10]

The city's action was also inconsistent with another stated purpose of the MMBA, to "promote full communication between public employers and their employees. . . ." (§ 3500.) By revoking the union's recognized status at the outset of the strike, the city extinguished the major conduit of communication between the employees and the city at the precise moment that the need for communication was greatest.[11]

---

[10]Interestingly, although seven states explicitly authorize revocation of union recognition as a sanction for strike activity (Delaware [14 Del. Code, § 4011(b)]; Maryland [Ed. Code, §§ 6-410(b) and 6-513(b)]; Minnesota [Stats. Ann., § 179.64, subd. (6)]; New Mexico [Regulations for the Conduct of Employee-Management Relations With Classified State Employees, § 18]; Oklahoma [70 Okla. Stats. Ann., § 509.8]; Iowa [Iowa Code Ann., § 20.12]; Florida [Fla. Stats., § 447.507(6)(a)]), the few state appellate courts that have considered the sanction have been reluctant to uphold it, expressing concern that it interferes with employees' rights to be represented by organizations of their own choosing. In *Ind. School Dist.* v. *Okl. City Fed. of Tchrs.* (Okla. 1980) 612 P.2d 719, the Oklahoma Supreme Court construed a statute providing that "If the professional or nonprofessional organization or its members engage in a strike, then the organization shall cease to be recognized . . ." as applying only during the duration of the strike. (at p. 720.) The court reasoned that any other interpretation "would destroy the purpose of the [public employee bargaining statute] by rendering the provisions creating an 'orderly process of communication' meaningless and nugatory. . . . If we were to hold that non-recognition could be imposed on an organization past the end of a strike, it would result in taking away from the educators the very thing the Act was designed to give them—the right to be represented by an elected representative in collective bargaining." (At p. 723.) Similarly, a Florida District Court of Appeal has held that, "While circumstances would support a governmental body's refusal to recognize a labor organization which has encouraged a strike by public employees, *at least during the period the organization has engaged in that wrongful activity,* these same circumstances may preclude a governmental agency from *permanently* refusing to recognize such organization *after the cessation of the wrongful activities.*" (*Local 532, Amer. Fed. Emp.* v. *City of Fort Lauderdale* (Fla.App. 1973) 273 So.2d 441, 445; orig. italics.)

[11]Another purpose of the MMBA is "to promote the improvement of personnel management and employer-employee relations . . . by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice. . . ." Aside from the fact that, as noted, revocation rules undercut that act's protection of the right to join organizations of the employees' choice, there is also reason to doubt that the city's actions were such as would lead to improved management-personnel relations. As one article notes: "[I]t is not uncommon for a public employer seriously to suggest that it should withdraw recognition from the union and to refuse to negotiate further with the union when a strike occurs. While the employer's response to a strike must necessarily depend on the facts in each case, the withdrawal of recognition frequently converts the strike from one over wages and working conditions to one over principle. A strike over principle is difficult to resolve and, from an employer's standpoint, if often counterproductive." (Shaw & Clark, *Public Sector Strikes: An Empirical Analysis* (1973) 2 J. L. & Ed. 217, 227.)

The scope of local government rulemaking power under Government Code section 3507 is limited by the policies and purposes of the MMBA. "Although the Legislature did not intend to preempt all aspects of labor relations in the public sector, we cannot attribute to it an intention to permit local entities to adopt regulations which would frustrate the declared policies and purposes of the MMB Act. . . . [T]he power reserved to local agencies to adopt rules and regulations was intended to permit supplementary local regulations which are 'consistent with, and effectuate the declared purposes of, the statute as a whole.' [Citation.]" (Fn. omitted.) (*Huntington Beach Police Officers' Assn.* v. *City of Huntington Beach, supra,* 58 Cal.App.3d 492, 501-502.) In view of the fact that the city's policy of revoking union recognition as a sanction for strike activities interferes with both the policies and purposes of the act, we conclude that it is impermissible.[12]

The city cites a number of National Labor Relations Board (NLRB) cases as evidence that its revocation of the union's status was "reasonable" despite the apparent conflict with the purposes of the act and the absence of statutory authority.[13] In the one closest in point, *Union Nacional de Trabajadores* (*Carborundum Co. of Puerto Rico*) (1975) 219 N.L.R.B. 862, enfd. *N.L.R.B.* v. *Union Nacional de Trabajadores* (1st Cir. 1976) 540 F.2d 1, cert. den. (1977) 429 U.S. 1039 [50 L.Ed.2d 750, 97 S.Ct. 736] (*Carborundum*)), the NLRB revoked the union's certification as exclusive bargaining agent because it had engaged in "brutal and unprovoked physical violence" and had an "extensive record of similar aggravated misconduct . . . evinc[ing] an intent to bypass the peaceful methods of collective bar-

---

[12]The dissent argues that the city had the right to revoke its recognition of the union because the MMBA contains no language expressly prohibiting its action. The problem with this approach is that the MMBA only permits public agencies to adopt "reasonable" rules for the administration of employer-employee relations. We must decide what is reasonable based on the language and intent of the act which, as noted, provides strong protection for the right of employees to be represented by unions of their own choosing. "[E]xcept as otherwise provided by the *Legislature* [—as opposed to local agencies—], public employees have the right to form, join, and participate in the activities of employee organizations *of their own choosing* for the purpose of representation on all matter of employer-employee relations." (§ 3502; italics added.) The city's action here is entirely inconsistent with this language.

[13]The city also cites the revocation of the Professional Air Traffic Controllers Organization's (PATCO's) recognition by the Federal Labor Relations Authority (FLRA) after the 1981 air traffic controllers' strike as an example of the "reasonableness" of the city's action. (PATCO and FAA, Case No. 3-CO-105; 7 F.L.R.A. No. 10; affd. *PATCO* v. *Federal Labor Relations Authority* (D.C.Cir. 1982) 685 F.2d 547.) However, that case is readily distinguishable because revocation of recognition was explicitly provided as a sanction for strike activity under the Federal Labor-Management Relations Act. (5 U.S.C. § 7120(f); 5 U.S.C. § 7103(a)(4).) Moreover, the action against PATCO was the first time in the history of the federal statute that the authority's power permanently to revoke the recognition of a union had been exercised. (See Taylor, *Execution of a Union: Move Against Controllers Group Seen as New Chapter in U.S. Labor History,* N. Y. Times (Aug. 19, 1981) p. A14, col. 1.)

gaining contemplated in the [NLRA]." (219 N.L.R.B. 863.) As the city points out, the decertification took place despite the absence of provisions in the National Labor Relations Act authorizing decertification for such conduct.

*Carborundum* does not support the city's position. It involves violence, not an illegal work stoppage. Even so, it is the only case in which the NLRB has revoked the certification of a labor union because it has engaged in violence.[14] The facts were extraordinary—the union, which had an extensive history of violence, engaged in conduct that made bargaining with management impossible. At a negotiating session, union representatives threatened to assault management negotiators. Later, the union president and three other union agents entered the employer's plant against the instructions of the guard and beat a supervisor and an employee who had worked as an organizer for a rival union. The intruders threatened to kill the employee.

Even so, on review, the First Circuit raised serious questions about the board's action. (540 F.2d at pp. 12-13.)[15] Referring to the board's use of the decertification remedy as "troublesome" and "novel," the court noted its "apprehension . . . that the Board's approach may be breaking new ground with insufficient sensitivity expressed on the record to the interests at stake. [¶] . . . What is at stake is not only the interest of the Union but also the interest of the employees at the Carborundum plant to be represented by the Union of their choice." (*Id.*, at pp. 14-15.) In this vein, the court also noted that, *"The value at stake, of course, is the interest of a majority of the Carborundum employees to be represented by their duly selected collective bargaining representative.* Here, where the Union has been selected the representative after a representation election, the employees have supplied the most reliable evidence of their desire to be represented by a particular labor organization. [Citation.] Before taking action that nullifies, even temporarily, the results of the election, we think that the Board should take steps to assure itself and a reviewing court that the action is necessary to *protect the collective bargaining and representational processes themselves.* [Fn. omitted.] *It should explicitly find that no alternative*

---

[14]The Ninth Circuit has consistently rejected the suggestion that employers be relieved of their duty to bargain based on the alleged violence of the union. "Even tortious union tactics do not relieve an employer of the duty to bargain in good faith." (*N.L.R.B.* v. *Ramona's Mexican Food Products, Inc.* (9th Cir. 1975) 531 F.2d 390, 394.)

[15]Although concluding that it "technically" had no jurisdiction to review the decertification decision because the union had failed to file a timely appeal from the dismissal of its unfair labor practice complaint, the court nonetheless felt that the issue was important enough that it should "express [its] general views on the propriety of the decertification order to provide guidance in the event that the Union is able to challenge the decertification order in a subsequent proceeding." (540 F.2d at p. 12.)

*remedy . . .* will be an equally effective means of protecting the values of the Act." (*Id.,* at p. 14; italics added.) The court also stressed that, "because of the important employee interests that are at stake the focus should be on promoting peaceful collective bargaining and *not on fashioning sanctions to deter Union misconduct.*" (*Id.,* at p. 15; italics added.)

There appears to be little question that revocation of union recognition as a sanction for strike activity would fail the tests suggested by the First Circuit in *Carborundum.* The concern underlying the NLRB's actions in *Carborundum* and in the later appeal discussing those actions, was not to impose a sanction for union misconduct but to protect the rights of the workers themselves. By engaging in conduct that physically "preclude[d] the maintenance of normal collective bargaining relationships" (540 F.2d at p. 13), the union had breached its obligation to represent the interests of its constituents. Moreover, the court of appeals noted that the union had attempted to "coerce the employees in the unit to refrain from seeking the Union's decertification." (*Id.,* at p. 13.) Thus, the only method available to the NLRB to protect the collective bargaining rights of the employees was, in the words of the board, to withdraw certification until "the employees are able to demonstrate their desires anew . . . and the . . . Union proves its majority among those employees through the Board's election process." (219 N.L.R.B. at p. 864.)

The problem in the strike context is quite different. The city does not contend that the revocation of a union's recognition after it has instigated a strike is intended to protect the workers' interest in the bargaining process. To be blunt, the action is intended only to punish the workers by stripping them of their representative. This is directly contrary to both the NLRA's and MMBA's protection of employees' rights to select their spokesmen.

Nor can the city contend that it is without other remedies in the strike context. In the past, numerous sanctions which do not interfere with workers' legitimate rights under the MMBA have been imposed in response to illegal strikes or strikes in violation of contract. (See, e.g., *City and County of San Francisco* v. *Evankovich* (1977) 69 Cal.App.3d 41 [137 Cal.Rptr. 883] [injunctive relief]; *Almond* v. *County of Sacramento* (1969) 276 Cal.App.2d 32 [80 Cal.Rptr. 518] [dismissal of striking employees]. See generally Taggart, *Legality of Strikes in California Public Education: A Management Perspective* (1978) 18 Santa Clara L.Rev. 895, 901-907; Robins, *Penalties in Strikes Against a Public Employer,* in Proceedings of NYU Twenty-Second Annual Conference on Labor (1969) p. 315; Jackson, *Public Employer Countermeasures to Union Concerted Activity: An Analysis of Alternatives* (1979) 8 J. L. & Ed. 73.) If the Legislature believes that an

additional remedy is warranted, and that revocation of a union's recognized status is likely to prove more beneficial than harmful (see fn. 10, *ante*), it can, of course, expressly authorize such revocation.

The city also directs our attention to *Independent Metal Workers Union, Local No. 1 and Local No. 2 (Hughes Tool Co.)* (1964) 147 N.L.R.B. 1573, in which the NLRB withdrew its certification of a union because it had engaged in race discrimination, as well as *Bekins Moving and Storage Co.* (1974) 211 N.L.R.B. 138, in which the board determined that it was obliged to withhold certification of racially discriminatory unions. These cases are easily distinguishable, for they were based on the principles of *Shelley* v. *Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441] and *Steele* v. *L. & N. R. Co.* (1944) 323 U.S. 192 [89 L.Ed. 173, 65 S.Ct. 226] (affirmative duty to represent all employees in a unit without discrimination). No similar issues are raised here.

Moreover, in *Handy Andy Inc.* (1977) 228 N.L.R.B. 447, the board explicitly overruled *Bekins, supra,* 211 N.L.R.B. 138, explaining that *Shelley* does not apply to the board's certification procedures because there is no "nexus between the Board's certification and any discrimination undertaken by a union which has received such a certification." In reaching this conclusion, the board reasoned that it "does not . . . by certifying a labor organization, place its imprimatur on all the organization's activity, lawful or otherwise. On the contrary, *a certification is neither more nor less than an acknowledgement that a majority of the employees in an appropriate bargaining unit have selected the union as their exclusive bargaining representative.* [Fn. omitted.] The choice of representative is made by the employees, and may not be exercised by this Board . . . ." (228 N.L.R.B. at p. 450, italics added.)[16] (See also Meltzer, *The National Labor Relations Act and Racial Discrimination*: *The More Remedies, the Better?* (1974) 42 U.Chi.L.Rev. 1.)[17]

Thus, far from supporting the city's argument that localities have the power to revoke recognition of unions despite the lack of statutory autho-

---

[16]The board also explained that its view "is buttressed by the indisputable fact that the Act predicates a union's bargaining representative status on its being chosen by a majority of the employees in the bargaining unit, not by the Board. Recognition of that status by the Board, through certification and/or a bargaining order, merely means that the Board is satisfied that a majority of the workers in the unit have chosen this union as their bargaining representative . . . ." (228 N.L.R.B. at pp. 450-451.)

[17]The board's opinion in *Handy Andy, Inc.* implies that *revocation* of certification for invidious discrimination may remain an appropriate remedy. (228 N.L.R.B. at p. 556, fn. 70; citing *Hughes Tool Co., supra,* 147 N.L.R.B. 1573.) Since the board has now rejected the application of *Shelley* to certification questions, its adherence to *Hughes Tool Co.* must be based on duty of fair representation principles.

rization, NLRA cases establish: (1) that the wishes of employees to be represented by employee organizations of their choosing is the sole concern in certification questions, (2) that interference with that right in the absence of statutory authorization, if permissible at all, is only permissible when it is necessary to protect the collective bargaining *and* representational processes, and no alternative remedy is available, and (3) that the focus must always be on promoting peaceful labor relations, not on fashioning sanctions to deter union misconduct. Judged by these standards, withdrawal of recognition as a sanction for union involvement in strike activity, whether legal or illegal, is clearly improper.[18]

This is not to say, of course, that under the MMBA revocation of recognition would necessarily be inappropriate in all situations. Since we are not faced with facts at all comparable to *Carborundum,* we have no occasion to determine whether revocation would be permissible in such a case.

Based upon the above discussion, we conclude that the city's revocation of the union's recognized status as majority representative was impermissible under the MMBA.[19]

---

[18]The city has not cited, and we have not found, any authority under the NLRA suggesting that decertification is a proper remedy for strikes in violation of contractual no-strike clauses or in violation of the NLRA itself. Amicus City of Vallejo, however, suggests that a rule permitting the suspension or withdrawal of recognition from a union instigating a strike "would not be unreasonable per se" based on the logic of *Boeing Airplane Co.* v. *National Labor Relations Bd.* (D.C.Cir. 1949) 174 F.2d 988.) The *Boeing* case stands "for the proposition that if an entire plant (or presumably a substantial majority of the employees) engages in a strike in violation of [NLRA] § 8(d), the workers lose their status as employees pursuant to § 8(d) of the Act. In such a situation, the Union has no employees to represent . . . ." (*N.L.R.B.* v. *Cast Optics Corporation* (3d Cir. 1972) 458 F.2d 398, 406, cert. den. (1972) 409 U.S. 850 [34 L.Ed.2d 92, 93 S.Ct. 58].) The "underlying rationale of . . . *Boeing* . . . [is] that where all the workers in a company lose their status as employees, the Union has lost its majority . . . ." (*Id.* at pp. 406-407.) We need not consider whether *Boeing* is persuasive authority under the MMBA, for it is clearly inapplicable here. The basis for the city's withdrawal of the union's recognition was not that the union had ceased to represent a majority of its employees; rather, it first withdrew its recognition of the union, and later fired the employees. More important, since 17 of the 18 fired employees were rehired, the union's loss of a majority was quickly remedied, and the city—even if it could have properly withdrawn recognition on Saturday, September 23—would once again have been under an obligation to recognize the union. As the *Cast Optics* court noted: "[W]hen all of the Company's employees who had engaged in the illegal work stoppage . . . returned to work, they regained their status as employees [fn. omitted] and likewise, the Union regained its position as the bargaining representative of the employees." (458 F.2d at p. 406.)

While we do not consider whether *Boeing* would be persuasive authority in a case where it was applicable, we hasten to emphasize that dismissal of employees is impermissible if its purpose is to intimidate, restrain, coerce or discriminate against those employees because of the exercise of their right to participate in an employee organization. (§ 3506.)

[19]The city also contends that the union is estopped from asserting that revocation of the union's recognition is prohibited under the MMBA because it agreed to the provisions of

## III

█ Plaintiff union members also contend that they were entitled to hearings before they were dismissed. We agree.

In *Skelly* v. *State Personnel Board* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774], we considered the procedural due process safeguards that must be afforded a permanent public employee prior to termination of employment. After reviewing the applicable state and federal decisions, particularly *Arnett* v. *Kennedy* (1974) 416 U.S. 134 [40 L.Ed.2d 15, 94 S.Ct. 1633], we concluded that "[a]s a minimum . . . preremoval safeguards must include notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline." (15 Cal.3d at p. 215.)

There is no question that all of the employees terminated by the city had a property interest in their continued employment. Although in the absence of any applicable local ordinance or resolution these employees would "hold office during the pleasure of the city council" (§ 36506), here the city had adopted personnel rules which provided, inter alia, that "[t]he City Council may discharge an employee in the classified service at any time but if the probationary period is completed, the discharge *must be for a stated cause.*" (Rule XIV, § 2, italics added.)[20] All of those discharged were full time, permanent, nonprobationary employees.

---

resolution No. 3, which contained the rule permitting revocation. Although the rule was enacted before the union was recognized, the city argues that the union agreed to be bound by the rule when it accepted language in the memorandum of agreement stating that, "The City shall not, by reason of the execution of this Agreement, abrogate or reduce the scope of any plan or rule, which is not specifically covered by this Agreement."

As under the NLRA, an agreement that thwarts the policies or purposes of the act will not be enforced. (See *City of Hayward* v. *United Public Employees* (1976) 54 Cal.App.3d 761 [126 Cal.Rptr. 710]; *J. I. Case Co.* v. *Labor Board* (1944) 321 U.S. 332, 337 [88 L.Ed. 762, 767, 64 S.Ct. 576].) However, under the NLRA, certain rights guaranteed by the act may be waived if the contract manifests a "clear and unmistakable" waiver (see *Timken Roller Bearing Company* v. *N.L.R.B.* (6th Cir. 1963) 325 F.2d 746, 751, cert. den. (1964) 376 U.S. 971 [12 L.Ed.2d 85, 84 S.Ct. 1135]; *Beacon Journal Pub. Co.* v. *N.L.R.B.* (6th Cir. 1968) 401 F.2d 366, 367-368) or there is evidence that the waiver was fully bargained-for. (*Jacobs Manufacturing Co.* (1951) 94 N.L.R.B. 1214, enforced *National Labor Relations Board* v. *Jacobs Mfg. Co.* (2d Cir. 1952) 196 F.2d 680.) We have no occasion to consider whether the right involved here may be bargained away, for the general provision in the memorandum of understanding stating that it did not "abrogate . . . any rule," is insufficiently precise to constitute a valid waiver, and the city has failed to direct us to any evidence in the record suggesting that the matter was bargained over, or even discussed, in negotiations leading to the memorandum of understanding. (See generally Morris, The Developing Labor Law (1971) at pp. 462-469.)

[20]The city does not dispute that this rule applied to the fired employees.

Despite this provision, the city maintains that *Skelly* does not apply, because, unlike in *Skelly,* the employees fired in the instant case were not formal "civil service" employees. However, both *Skelly* and *Perry* v. *Sindermann* (1972) 408 U.S. 593 [33 L.Ed.2d 570, 92 S.Ct. 2694], clearly establish that constitutional due process protections are not based on a "civil service" label, but upon the " 'existence of rules and understandings, promulgated and fostered by state officials, that . . . justify his legitimate claim of entitlement to continued employment absent "sufficient cause." '. . ." (*Skelly, supra,* 15 Cal.3d at p. 207; quoting *Perry* v. *Sindermann, supra,* 408 U.S. 593, 602-603 [33 L.Ed.2d 570, 580].) The "civil service" distinction proposed by the city was explicitly rejected in *Mendoza* v. *Regents of University of California* (1978) 78 Cal.App.3d 168 [144 Cal.Rptr. 117]: "[W]hether an employee should be accorded the minimum due process safeguards prior to discharge ought not, and does not, turn on the eventuality that he is employed in the civil service system . . . . *The overriding consideration rather is whether the employee has a constitutionally protected property interest in his continued employment.*" (78 Cal.App.3d at pp. 173-174; orig. italics.) "It is, of course, widely recognized that if the employee is subject to discharge only for cause, he has a property interest which is entitled to constitutional protection [citation]." (*Id.* at p. 175; accord *Williams* v. *County of Los Angeles* (1978) 22 Cal.3d 731, 736 [150 Cal.Rptr. 475, 586 P.2d 956]; see also *Healdsburg Police Officers Assn.* v. *City of Healdsburg* (1976) 57 Cal.App.3d 444, 451 [129 Cal.Rptr. 216].)

The city also argues that, even if the employees had a property right in their continued employment, a hearing was unnecessary because "[i]t is not disputed that the employees engaged in a strike." (Cf. *Codd* v. *Velger* (1977) 429 U.S. 624, 626-627 [51 L.Ed.2d 92, 96, 97 S.Ct. 882].) Even if all the employees had conceded their participation in the strike prior to their termination, the city had discretion regarding the appropriate sanction to impose. Rule XV, section 1 provided that "[t]he extent of disciplinary action shall be commensurate with the offense" and that "the employee's prior employment history may be considered as pertinent in the determination." Resolution No. 3 provided, inter alia, that "participation by an employee in a strike . . . shall subject the employee to disciplinary action, *up to and including discharge.*" Thus, at the very least, a hearing was required to determine the nature and extent of the appropriate disciplinary action. (Compare *Dixon* v. *Love* (1977) 431 U.S. 105 [52 L.Ed.2d 172, 97 S.Ct. 1723] [post-license revocation hearing sufficient where revocation or suspension "largely automatic" after conviction of certain traffic offenses with-

in a specified period, and where opportunity for full judicial hearing in connection with each of the traffic offenses].)[21]

Alternatively, the city contends that in emergencies *Skelly* permits dismissal of permanent employees without a prior hearing, and suggests that the strike constituted such an emergency. We need not consider whether some emergencies justify dispensing with predismissal safeguards for, even assuming the strike constituted an emergency, the city fails to explain how dismissing all of its striking employees without a hearing would alleviate the emergency. Indeed, the record here suggests that the city's haste in firing its employees only prolonged the "emergency" after the employees had offered to return.

Finally, the city argues that the strike "constituted a constructive resignation thereby relieving [it] from any obligations [under *Skelly.*]" This contention is frivolous. Considering that the workers were absent for just one day, and spent that day picketing in front of the city hall, the city could not have reasonably concluded that the workers had abandoned their positions. Nor has the city suggested that city or state rules permitted automatic termination of employees absent for an extended period, let alone a single day. (Cf. *Armistead* v. *State Personnel Bd.* (1981) 124 Cal.App.3d 61 [177 Cal.Rptr. 7] [state statute providing automatic resignation for absence without leave of five days]; *Willson* v. *State Personnel Bd.* (1980) 113 Cal.App.3d 312 [169 Cal.Rptr. 823] [same statute]; *Baker* v. *Wadsworth* (1970) 6 Cal.App.3d 253 [85 Cal.Rptr. 880] [city rule providing that employee absent seven consecutive days has resigned].)

Although we conclude that the city improperly denied the employees' rights to pretermination hearings, the remedy requested by the union, reinstatement, is not appropriate. (See *Barber* v. *State Personnel Bd.* (1976) 18 Cal.3d 395, 402 [134 Cal.Rptr. 206, 556 P.2d 306]; *Kirkpatrick* v. *Civil Service Com.* (1978) 77 Cal.App.3d 940, 945 [144 Cal.Rptr. 51].) In any event, it appears that all but one of the affected employees have been rehired. Because the record contains no specifics regarding (1) the period during which the rehired employees were out of work and (2) the post-termination procedures, if any, afforded to employee Knox,[22] we reverse the judgment and remand the case for a determination of the appropriate relief to be afforded the dismissed employees.

---

[21]The city also argues that since property rights are created by "existing rules and understandings" (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 577 [33 L.Ed.2d 548, 92 S.Ct. 2701]), and resolution No. 3 prohibits strikes by city employees, any property right conferred by the personnel rules "was not an absolute right but carried with it a *quid pro quo* obligation of the employees not to strike." However, since dismissal of strikers was discretionary, not automatic, and there is no exception to the dismissal for "cause" provisions suggesting that they do not apply to strikers, the contention is unfounded.

[22]Knox is the lone employee who was not rehired.

Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., and Constine, J.,* concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—Public employee strikes are illegal. They cannot and should not be condoned. To permit, for example, the firemen of the City of Gridley to instigate a strike is to permit them to hold hostage to their demands the very lives and property of the citizens of Gridley. My colleagues should forthrightly, clearly, and unmistakably acknowledge this. (See *San Diego Teacher's Assn.* v. *Superior Court* (1979) 24 Cal.3d 1, 15-18 [154 Cal.Rptr. 893, 593 P.2d 838], dis. opn.) It follows that the employees of the public works, fire and finance departments of the City of Gridley were acting outside the law when they struck. It is with this underlying principle in mind that I concur insofar as it may appear that the record is inadequate to determine whether the City of Gridley's failure to afford its employees a pretermination hearing violated its own rule allowing dismissal "for stated cause" thereby resulting in prejudice to some or all of those employees. Accordingly, remand to flesh out the record on those issues and to provide any appropriate relief appears warranted.

I respectfully dissent, however, from the majority's attempt to rewrite the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.; hereinafter the MMBA or the act) with respect to revocation for cause of a union's formal recognition. The purpose of the majority's redrafting, presumably, is better to achieve what it perceives to have been the goals of the act. Whether the majority's law is a "better" one, of course, is beside the point. We are under a constant admonition well expressed by Justice Cardozo: "We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take the statute as we find it." (*Anderson* v. *Wilson* (1933) 289 U.S. 20, 27 [77 L.Ed. 1004, 1010, 54 S.Ct. 417].)

The MMBA decribes its purpose in this context *"to promote full communication* between public employers and their employees *by providing a reasonable method of resolving disputes* regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations . . . . *Nothing contained herein shall be deemed to supersede . . . rules of local public agencies . . . which provide for other methods* of administering employer-employee relations *nor is it intended that this chapter* [embodying the MMBA] *be binding upon those public agencies which provide procedures* for the administration of employer-em-

---

*Assigned by the Chairperson of the Judicial Council.

ployee relations *in accordance with the provisions of this chapter. . . ."* (Gov. Code, § 3500, italics added.)

As a matter of first impression, it could have been argued that in enacting the MMBA, the Legislature simply provided one "reasonable method" of resolving local public employer-employee disputes, while clearly emphasizing that "other methods" employed by local jurisdictions to resolve those disputes were *not* to be superseded. Further, in offering local public agencies the option of adopting "procedures" in accordance with the MMBA, it could be noted that the Legislature stipulated that any such agency which chose to adopt MMBA procedures was *not* to be bound by provisions in the act which otherwise might appear mandatory in the local implementation of those procedures. Apparently, however, we are at least committed to the proposition that local regulations in this area must be "consistent with the purposes of the MMBA." (*Los Angeles County Civil Service Com.* v. *Superior Court* (1978) 23 Cal.3d 55, 63 [151 Cal.Rptr. 547, 588 P.2d 249].)

Nonetheless, in my opinion, that modest requirement of consistency with the purposes of the MMBA is expanded beyond recognition by the majority's construction of the act here. By stretching to the breaking point the legislative guidelines which the MMBA affixed to the vessel of local public agencies' employer-employee relations, the majority comes perilously close to setting it adrift in the uncertain seas of public policy. However well-intentioned, this judicial interference with the legislative will misconceives our role in the scheme of things.

Prior to the union's designation as a "recognized employee organization" by the City of Gridley in April 1974, the city adopted two relevant resolutions governing relations with its employees. Resolution No. 2 provided the mechanism for the employees' selection of their representative organization and the city's formal recognition of that organization. Resolution No. 3 provided, inter alia, for the suspension or revocation of that recognition if a recognized employee organization encouraged or condoned a strike. The union was fully aware of those rules and, indeed, obtained its own "recognition" pursuant to them. Subsequently, according to the undisputed findings of the trial court, the union engaged in the strike activity which was directly prohibited by resolution No. 3.

The city's revocation of the union's recognition thus was expressly authorized by the city's rules. In addition, the trial court expressly found that the city's exercise of that authority here was justified by the facts adduced at trial demonstrating that the union did, in fact, encourage or condone the strike of the city's public works, fire and finance department employees.

There being substantial evidence in the record to support those findings, there is no basis whatever for our interference with the trial court's judgment.

Further, assuming that the MMBA was intended *both* to supersede any inconsistent local rules governing employee relations and to bind local entities which chose to adopt procedures identified in the act, that legislation requires no different result here. To the contrary, it is clear that the MMBA contemplates the enactment of local regulations to cover those areas of employer-employee relations which are not specifically covered by the act, such as revocation of a union's recognition for appropriate cause. In my view, the city's resolution No. 3 conforms to that expectation.

The majority apparently freely acknowledges each of the following propositions, which together ineluctably lead, in my opinion, to the conclusion that the city's resolution is valid, even when that resolution is measured by the standards of the MMBA, to wit: that (1) "the act leaves to local government agencies the power to establish and enforce rules governing relations with their own employees" (*ante,* p. 197); (2) a local government's obligations to a union depend upon *recognition* of the union by that government (see Gov. Code, §§ 3503, 3505; *ante,* p. 198 and fn. 6); (3) the act specifically provides that a local "*public agency may adopt* reasonable rules and regulations . . . [which] may include *provisions for . . . recognition* of employee organizations . . ." and that such an agency is enjoined only from *unreasonably* withholding recognition of an employee organization (Gov. Code, § 3507, italics added; *ante,* p. 199); and (4) the act neither authorizes nor prohibits a local public agency's revocation of a union's recognition for strike activity (*ante,* p. 199). Indeed, with respect to the last point, the majority frankly concedes that the Legislature chose not to deal with the question of *revocation* of recognition at all (*ante,* p. 199), presumably for the same reason it is seen as having left the matter of *recognition* to local regulation—lack of any legislative consensus. (See *ante,* p. 200, fn. 8.)

Even under the majority's interpretation of the MMBA as preemptive of *inconsistent* local regulation, then, the act's failure to deal with revocation, together with its express general and specific authorization of local public agencies to adopt and enforce their own employee relations rules, strongly suggests to me that the revocation of recognition for cause is a prime area for exercise of local regulatory power under the act. Apparently, however, in pursuing the majority's premises to their logical conclusion, we presume too much. Rather, we are counseled to measure the city's regulation governing revocation of recognition for strike activity by what the majority

perceives is the MMBA's "guiding principle of . . . employee choice." (*Ante,* p. 201.)

Beyond observing the obvious—that the majority's selection of *its* "guiding principle" ignores the express purpose and intent of the MMBA as codified in the very legislation itself—I also note that there is a wide gap in the majority's reasoning between its "principle" and its conclusion invalidating resolution No. 3. For, although my colleagues first candidly acknowledge that there is no necessary connection between "the Legislature's determination that recognition must be based on employee choice" and the question, under the act, "whether a local government has the power to revoke recognition for other reasons" (*ante,* p. 201), the majority then simply ignores that clear distinction in apparent deference to its newly discovered principle: Apparently, nothing more than inconsistency with the "guiding principle of . . . employee choice" kills the city's resolution No. 3 and its revocation of the union's recognition pursuant thereto. (See *ante,* p. 201.)

The majority's alternative attack on resolution No. 3 on the ground of "unreasonableness" seems to me equally unfounded. The threat of revocation of a union's recognition for encouraging or condoning an illegal strike impresses me as a sound means of achieving the goals of the MMBA. While it is clearly in the interest of the employees of the city to afford themselves an opportunity to be represented at the "meet and confer" table by an organization of their choice, it is no less in the interest of the citizens of the city that essential governmental functions continue while those discussions take place. Further, it must be remembered that the MMBA creates no neutral board to provide prompt adjudication of "unfair labor practices" and thus to forestall prolonged interruption of city services while differences are being resolved. Resolution No. 3 is a reasonable means of keeping the parties both at the "meet and confer" table and at work, thus furthering both the act's goal "to promote full communication between public employers and their employees . . ." (Gov. Code, § 3500) and the public interest. Contrary to the majority's perception (see *ante,* p. 201), it was not the *city* which severed the "major conduit" of information between employer and employees; it was the *union* which extinguished the last flickering flame of communication between the two by promoting the illegal strike and mandating invocation of resolution No. 3 to deal with the crisis in public affairs which was triggered by the strike.

Nor can the city's revocation of the union's recognition for illegal activity be considered "unreasonable" per se in view of the statutory and decisional approval of such sanctions in other contexts of which the majority is aware.

(See *ante,* pp. 202-203, 205, 206 and fns. 13 and 18.) Indeed, the majority admits "that under the MMBA revocation of recognition would [not] necessarily be inappropriate in all situations." (*Ante,* p. 206.) This disclaimer is wholly inconsistent with the claim that such sanction is unreasonable per se.

In brief, the majority attempts to substitute a consistent statutory framework for one it perceives as "sketchy and frequently vague." While that goal may be commendable, in my view the majority goes too far with its renovations, "remodeling" an edifice which the Legislature never erected, presumably because of a lack of legislative consensus to do so.

Justice Frankfurter put the guiding interpretive principle well: "[N]o one will gainsay that the function in construing a statute is to ascertain the meaning of words used by the legislature. To go beyond it is to usurp a power which our democracy has lodged in its elected legislature . . . . A judge must not rewrite a statute, neither to enlarge nor to contract it. Whatever temptations the statesmanship of policy-making might wisely suggest, construction must eschew interpolation and evisceration. He must not read in by way of creation." (Frankfurter, *The Reading of Statutes,* in Of Law and Men (Elman edit. 1956) p. 53.)

Except as indicated heretofore, I would discharge the writ.